**Harry MOORE, Trustee, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 25898.**

United States Court of Appeals
Fifth Circuit.
June 23, 1969.

Allan L. Poage, El Paso, Tex., Jack Bryant, Abilene, Tex., Raymond A. Lynch, Midland, Tex., for appellant.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Chombie J. D. Garrett, John J. McCarthy, Richard M. Roberts, Jerome H. Fridkin, Attys., Dept. of Justice, Washington, D. C., Ernest Morgan, U. S. Atty., Harry Lee Hudspeth, Asst. U. S. Atty., of counsel, for appellee.

Before THORNBERRY and SIMPSON, Circuit Judges, and CASSIBRY, District Judge.

THORNBERRY, Circuit Judge:

This case involves federal tax claims asserted by the Commissioner against the estate in bankruptcy of Billy Sol Estes. Harry Moore, Trustee for the bankrupt, appeals from the district court's decision in favor of the Government. In so doing, he doubtless has the unqualified support of the numerous creditors who will be adversely affected by a huge award of federal taxes. The Commissioner's original proof of claim asserted tax liabilities for the years 1959–61 in the total amount of $12,289,316.76. The breakdown of the amounts against which the tax claims are asserted is as follows:

*Calendar year 1959:*

|  |  |  |
|---|---|---|
| (a) | Disallowed fertilizer expense deduction | $1,594,832.42 |
| (b) | Unreported income from discount of commercial paper to finance companies | 164,545.94 |
| (c) | Other income and disallowed deductions | 2,193,059.64 |

*Calendar year 1960:*

|  |  |  |
|---|---|---|
| (a) | Disallowed fertilizer expense deduction | $1,212,929.03 |
| (b) | Unreported income from discount of commercial paper to finance companies | 3,653,335.22 |
| (c) | Other income and disallowed deductions | 4,684,098.19 |

*Calendar year 1961:*

|  |  |  |
|---|---|---|
| (a) | Disallowed fertilizer expense deduction | $1,808,279.13 |
| (b) | Unreported income from discount of commercial paper to finance companies | 7,902,677.02 |
| (c) | Other income and disallowed deductions | 6,052,722.88 |

Item (c) for each of these years ("other income and disallowed deductions") is not involved in this case and is apparently being held in abeyance pending final adjudication as to items (a) and (b). After a hearing on items (a) and (b), the referee sustained the Trustee's objections and rejected the Government's claims in full. The district court reversed the referee. Thus, the question to be decided is whether the referee or the district court correctly evaluated the Government's contention that deductions taken by Estes for fertilizer expense [item (a)] should be disallowed and that money he received from the discounting of commercial paper [item (b)] should have been reported as income. We consider these matters in reverse order.

### I. *Unreported Income*

In passing on the issue of unreported income as well as the deductions for fertilizer expense, we must take care not to lose sight of the appropriate standard of review: "We do not determine whether the district judge's findings were clearly erroneous but whether the findings of the referee were; if the referee's findings were not clearly erro-

neous the district judge was bound to accept them." Bazemore v. Stehling, 5th Cir. 1968, 396 F.2d 701, 703. While we recognize we must focus primarily on the referee's findings, we hasten to admit that the ensuing description of the factual context out of which this tax dispute arose is based largely on the thorough fact findings entered by the district court. To the extent that his findings developed the factual background, i. e., the scheme employed by Estes to obtain large sums of money needed for expanding his operations, the district judge was not in disagreement with the referee but simply more thorough. The district judge and refere did not have conflicting views about the method employed by Estes to obtain money though they drew different inferences from the undisputed facts.

Billy Sol Estes had a pyramid of businesses numbering somewhere between forty and fifty. What he needed to keep everything in motion was a steady influx of large sums of cash. To this end, he devised a highly ingenious, albeit highly unlawful scheme. Other participants in the scheme were the Superior Manufacturing Company (hereinafter referred to as Superior) and the Lubbock Machine and Supply Company (hereinafter referred to as Lubbock), manufacturers of anhydrous ammonia tank equipment. The first step was for Estes to persuade various farmers in the West Texas area to sign promissory notes and chattel mortgages for the purchase of anhydrous ammonia tanks from Superior and Lubbock. He led the farmers to believe that they would be loaning him their credit, that he would be using the tanks in his business, and that he would lease the tanks from them at a rental equivalent to their note payments. He not only guaranteed their note payments but promised a bonus equal to 10% of the cost of each tank purchased. Thus, so far as the farmers were concerned, they were getting a 10% fee for signing their names to notes and chattel mortgages. They never expected to use the tanks but thought that Estes was using them in his business. They expected their note payments to the manufacturers to be covered by Estes' rental payments to them.

The next step was for Superior and Lubbock to sell the notes and mortgages to various finance companies at a discount. They in turn received checks from the finance companies for the discount price and deposited them in their accounts. Thereafter, they remitted 90% of the proceeds to Estes, retaining 10% as a fee for their part in the transaction. In purchasing the notes and mortgages, the finance companies were under the impression that Superior and Lubbock were selling actual tanks to numerous farmers and that the sales were being made on the farmers' credit. They had no idea that Billy Sol Estes was involved until they investigated a local newspaper story that farmers were buying nonexistent tanks. The truth of the matter was that Superior and Lubbock were not manufacturing any of the tanks and that Estes was receiving 90% of the proceeds from the discount sales of commercial paper. Moreover, the farmers were not intending to commit any of their own resources to the purchase of tanks but thought they were helping Estes buy them and that they would be fully reimbursed by Estes.

Between 1959 and 1961, Superior and Lubbock sold approximately 300 promissory notes and mortgages to thirteen different finance companies. The instruments of indebtedness were obtained from 70 different farmers. Billy Sol Estes received from Superior and Lubbock the sums of $215,137.56 in 1959, $4,197,919.88 in 1960, and $10,959,991.28 in 1961. He used these large sums of cash to expand his operations though part of the money necessarily had to be remitted to the farmers under his agreements with them. He made so-called rental payments of $50,591.62 in 1959, $544,584.66 in 1960, and $3,057,314.26 in 1961, which sums the Government has treated as necessary expenses of a swindle. Accordingly, after subtracting these necessary expenses, Estes received the net sums of $164,545.94 in 1959, $3,653,-

335.22 in 1960, and $7,902,677.02 in 1961, which sums the Government says he should have reported as income for the calendar years in question. He did not report them and the Trustee argues that he was not required to do so because they represented the proceeds from loans.

Estes made regular payments to the farmers up to the time of bankruptcy, but no matter how sincere he may have been in his intention to keep up the payments, it cannot be denied that he was swindling the finance companies out of large sums of money. The finance companies were unaware that Estes was involved in the tank sales and that the tanks were nonexistent. More importantly, the companies had no intention of extending unlimited credit to him and did not realize that this was the effect of their business with Superior and Lubbock. They had no agreement with Estes concerning the terms of repayment and no collateral from him. Knowing that he did not have this kind of credit, Estes used the farmers and manufacturers as front men and paid them each a fee. What he could not obtain through honest, arms' length loans from the finance companies, he obtained through his elaborate scheme, the total for a three-year period being in excess of $15,000,000. In the same period, the finance companies got back less than $4,000,000 by way of Estes' payments to the farmers. The question is whether the net sum received in these years, which exceeded $11,000,-000, should have been reported as income.

■ For purposes of this case we need describe only the broad outlines of the relevant tax principles. An economic gain is includable in gross income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it; and it is well settled that unlawful, as well as lawful, gains are comprehended within the term "gross income." Rutkin v. United States, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833. Thus, income derived from extortion, embezzlement, or swindling is includable in gross income and must be reported by the recipient.

James v. United States, 1961, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246; Rutkin v. United States, *supra*; United States v. Rochelle, 5th Cir. 1967, 384 F.2d 748; Cohen v. United States, 9th Cir. 1962, 297 F.2d 760; Briggs v. United States, 4th Cir. 1954, 214 F.2d 699; In re Parr, S.D.Tex.1962, 205 F.Supp. 492. In this case, the unlawful activity is most accurately described as swindling; that is, the obtaining of money through some false pretense or device. Rollinger v. United States, 8th Cir. 1953, 208 F.2d 109, 112. As opposed to unlawful economic gains which must be reported as income, the proceeds from a bona fide loan do not constitute income because whatever temporary economic benefit the borrower derives from the use of the funds is offset by the corresponding obligation to repay them. United States v. Rochelle, *supra*, 384 F.2d at 751. Whether a certain transaction constitutes a loan for income tax purposes is a factual question involving several considerations, but a distinguishing characteristic of a loan is the intention of the parties that the money advanced be repaid. Commissioner v. Makransky, 3d Cir. 1963, 321 F.2d 598, 600; 1 Mertens, Federal Income Taxation § 5.12, at 32 (1962 ed.). On the facts of this case, the referee concluded that despite the unlawfulness of his activity, Estes received money under such conditions as to create a debtor-creditor relationship, the critical feature of which was that he recognized an obligation to repay all money advanced. We agree with the district court that this finding was clearly erroneous.

■ In holding that Estes "borrowed" the funds in question, the referee neglected to identify who he considered the lenders to be, which suggests to us that he sensed the difficulty of his position. We think Estes did have what amounted to loan agreements with the farmers: They loaned him their credit for a 10% fee and with the expectation that he would ultimately cover the notes and mortgages on which they were making themselves primarily liable. They were not buying the tanks for themselves

and would not have signed the instruments of idebtedness unless they had understood that Estes was in turn indebted to them. On the other hand, the cash Estes obtained did not come from the farmers or the manufacturers but from the finance companies. The companies did not know they were loaning him any money, did not intend to loan him any money, and did not have any agreement with him concerning the terms of repayment. The Trustee argues, however, that Estes' arrangements with the farmers were tantamount to loan agreements between him and the finance companies and should be considered as such for income tax purposes. Very persuasively he points to the fact that each month Estes made payments to the farmers equivalent to their note payments and that he was obligated by contracts to keep up the payments and had to keep them up if he was to keep his business going. Despite the forcefulness with which this argument has been made, we are unable to assimilate the arrangements between Estes and the farmers to loan agreements between Estes and the finance companies. Though he made regular payments and may have intended that one day the finance companies would be reimbursed in full, we cannot say that the good intention of a swindler whose identity is unknown to the party from whom the money is being obtained is the same in law and in fact as a consensual loan arrangement between two parties. In purchasing the notes and mortgages, the finance companies understood that loans were being made to 70 different farmers who were buying anhydrous ammonia tanks that would stand as security. Had they known the loans were all going to one person and that no tanks were being manufactured, they would not have bought the commercial paper. They would not have loaned Estes such enormous sums without having sufficient collateral from him. Hence we conclude that the companies dispensed their funds under circumstances more clearly resembling a swindle than a loan and not enough like a loan to be characterized as such for income tax purposes.

The case most closely in point involved another West Texan named McSpadden who did exactly the same thing as Estes. *See* Rozelle McSpadden, 1968, 50 T.C. 478. There, as here, it was argued that McSpadden's arrangements with the farmers were tantamount to loan agreements between him and the finance companies. The contention was rejected in language we find worth repeating:

> \* \* \* the evidence is not convincing that McSpadden actually had ever formed a clear intent to discontinue his fraudulent activities and to pay off all the mortgages. \* \* \* It is likely that every embezzler and some swindlers justify their actions to themselves by convincing themselves that they intend to return or repay the illegally obtained funds. Since thoughts or "plans" do not cause the illegally obtained funds to be "loans," such rationalization is not even an intention to repay as the term is used in determining whether an amount received by an individual is a loan. At most the recipient of illegal funds has some vague hope that he will replace or repay the amount illegally obtained.

50 T.C. at 489. As this language suggests, the Trustee for Estes, like McSpadden, is advancing the same argument as might be advanced by a bank employee who has embezzled funds from his bank. He might say that the embezzled funds were clearly on loan to him inasmuch as he was making gradual restitution, had recognized a legal obligation to repay in full, and would have had to repay in full to avoid being caught. Yet under James v. United States, *supra*, embezzled funds are not considered proceeds of a loan but must be reported as income. The reasoning of *James* is that while an embezzler has a legal obligation to repay and may intend to repay, his legal obligation and intent are not the same as an actual agreement between lendor and borrower entailing "consensual recogni-

tion" of an obligation to repay and exact conditions of repayment. *See* 366 U.S. at 219, 81 S.Ct. at 1055, 6 L.Ed.2d 246. Similarly, we do not think swindled funds can be considered proceeds of a loan even though the swindler intended to make full restitution and had legally enforceable agreements with certain third parties to make repayments. In these circumstances, there is still an absence of an agreement between the actual lender and borrower entailing "consensual recognition" of an obligation to repay and exact conditions of repayment. Estes had a legal obligation to make full restitution, but he did not have a hard-and-fast agreement with the finance companies to do so. As we read *James*, Estes' legal obligation to repay, which arose by operation of law and also by virtue of his agreements with the farmers, cannot be equated with a consensual agreement between him and the finance companies. The absence of a consensual agreement between the party providing the money and the party receiving it is fatal to the Trustee's contention that the money should be excluded from gross income on a loan theory. Therefore, it must be treated as income.

## II. *Deductions for Fertilizer Expense*

■ In operating his fertilizer business, Estes kept his books on the accrual basis and recorded as an expense and liability the cost of fertilizer as billed to him by the Commercial Solvents Corporation. His books indicate that fertilizer supplied by Commercial Solvents cost between $80 and $90 per ton and in his tax returns for 1959–61 he claimed deductions based on a cost of between $80 and $90 per ton. However, he filed a financial statement with a federal agency in which he omitted the fertilizer expense and liability in computing his net worth. On the basis of his failure to state the true extent of his liabilities, the Government instituted a criminal case against him for filing a false financial statement with a federal agency. At his trial in 1965, Estes took the stand and testified that he had not filed a false financial statement but rather that his books were false. He said his liability for fertilizer was much less than the recorded cost of $80 to $90 per ton would indicate because he had an under-the-table deal with the president of Commercial Solvents, who was dead by the time of the trial, to pay only $40 per ton. After he was acquitted of the criminal charge, the Government turned his testimony against the Trustee in bankruptcy and creditors by asserting that the deductions of $80 to $90 per ton should be disallowed. The referee rejected this contention, but the district judge set aside the referee's finding.

We are faced with the purely factual question of whether the deductions of $80 to $90 per ton should be disallowed.[1] The principal evidence supporting the deductions is that the books kept by both Estes and Commercial Solvents reflected a price of $80 to $90 per ton. Moreover, three of the company's officers filed affidavits to the effect that the price shown on the books was the actual price and that there was no oral agreement or under-the-table deal for a lower price. On the other hand, the evidence supporting the Government's position is that Estes testified at his criminal trial that he had a deal with the former president of Commercial Solvents to pay only $40. Also, there was hearsay testimony at the bankruptcy proceeding to the effect that two other people said they overheard Estes negotiating with the president of Commercial Solvents. One factor that casts doubt on Estes' testimony at the criminal trial is that it was completely self-serv-

---

1. We proceed to the merits of the Government's claim against the deductions for fertilizer expense through the Trustee urges that the claim was not timely filed and should not be considered at all. Since we have concluded on the merits that the deductions must be allowed, we have not concerned ourselves with whether the claim for disallowance was timely filed.

ing: To rebut the prosecution's charge that he had filed a false financial statement in which he understated his liability for fertilizer expense, he testified that the liability shown on the financial statement was not understated but rather that the fertilizer price shown on his books was overstated. A second factor detracting from the Government's case is that Commercial Solvents is a well-established company whose books are audited by Ernst and Ernst and whose stock is listed on the New York Exchange. The idea that the president made an under-the-table deal with Billy Sol Estes which would cost his company millions of dollars but was never detected by other officers or the auditors is not altogether credible.

We think the best that can be said for the Government's position is that there is some evidence to support it. Likewise, there is some evidence to support the Trustee. With the factual dispute in this posture on appeal, the standard of review becomes determinative. Under Bazemore v. Stehling, *supra*, we look to the referee's finding in favor of the Trustee to determine whether it was clearly erroneous. We cannot say that it was, since our review of the entire record does not leave us "with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746. Since his finding was not clearly erroneous, the district judge was bound to accept it and erred when he set it aside.[2]

The judgment of the district court is affirmed as to the unreported income and reversed as to the deductions for fertilizer expense.

2. With respect to the deductions for fertilizer, the Government also argues that a taxpayer cannot accrue an expense that he is denying or contesting. Since Estes testified at the criminal trial that his books did not accurately reflect the agreed price, it is contended that he could not lawfully accrue the disputed fertilizer price and deduct on the basis of the accrual. The referee's finding in favor of the Trustee implicitly rejected Estes' testimony at the criminal trial. Since we have sustained the referee in this respect, it follows that there was no dispute as to the fertilizer expense. Therefore, the Government's argument must fail.