STANLEY E. KREIMER and BETTY J. KREIMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HARRY L. WALSH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kreimer v. Commissioner
Docket Nos. 17618-80, 17619-80
United States Tax Court
T.C. Memo 1983-672; 1983 Tax Ct. Memo LEXIS 114; 47 T.C.M. (CCH) 260; T.C.M. (RIA) 83672; November 9, 1983. *114 Petitioners were in the business of writing indemnity bonds or financial guarantee bonds, for both a corporation owned by them and for Interstate, an unrelated insurance company. In order to pay for the stock of a surety company they purchased from a third party, petitioners with the help of others, devised a scheme to borrow money on the security of Interstate financial guarantee bonds which they issued. To prevent Interstate and the lenders from discovering that they were issuing the bonds for their own benefit, petitioners arranged for third parties to borrow the money, secured by the bonds, and then transfer the borrowed funds to petitioners or a corporation owned by them. Petitioners and their corporation assumed liability on the notes given by the third party borrowers to the lenders. Interstate terminated the arrangement with petitioners and petitioners permitted the loans to go into default. Interstate paid the lenders under the bonds issued in its name and brought suit against petitioners and their corporations to recoup its losses. Petitioners paid Interstate its losses and the suit was settled. Held: The borrowed funds received by petitioners were loans which *115 petitioners at all times intended to repay, and did repay. The funds were not taxable gross income to petitioners. Held,Further: Additions to tax for fraud under section 6653(b) not imposed. Frank J. Shannon, III, for the petitioners. Charles P. Hanfman, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined the following deficiencies and additions to tax in petitioners' 1971 Federal income tax: Addition to Tax [1]
Petitioner
Deficiency
Sec. 6653(b)
Harry L. Walsh
$251,858.82
$125,929.41
Stanley E. & Betty J. Kreimer
199,712.42
106,609.11
After concessions, [2] the issues *116 are (1) whether various amounts obtained by petitioners in the form of loans are includible in gross income, and (2) whether petitioners are liable for the addition to tax for fraud. [3]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by reference. Petitioners Stanley E. Kreimer (Kreimer), and Betty J. Kreimer resided in Atlanta, Georgia on the date their petition was filed herein. They filed a joint income tax return for 1971, and an amended joint return, with the Internal Revenue Service Center in Chamblee, Georgia. Petitioner Harry L. Walsh (Walsh) also resided in Atlanta, Georgia on the date the petition was filed herein. [4] He filed a married-filing separately income tax return for 1971 with the Internal *117 Revenue Service Center in Chamblee, Georgia. Kreimer is a college graduate who did graduate work at the Wharton School of Finance and Ohio State University. He entered the insurance business in Cincinnati, Ohio in about 1953. He wrote surety bonds and other types of insurance. In 1961, he moved to Atlanta, Georgia and opened a general insurance business with two other individuals. Walsh attended Dartmouth College. He started in the insurance business as a property and casualty adjustor in 1947. He became associated in 1956 with a long-haul trucking insurance company and operated a general insurance agency. In 1962 he formed an insurance company in Madison, Wisconsin. He moved to Atlanta in June, 1962 after his wife died. Kreimer and Walsh became business associates in 1963 when they formed National Insurance Services (National), which wrote surety bonds. Petitioners, through National, were general agents for United Bonding Insurance Company and issued surety bonds in the name of that, and other, companies. Guaranty Management Company, Inc. (Guaranty) *118 was incorporated in the State of Georgia on July 1, 1965. Petitioners each owned 50 percent of Guaranty's stock. Initially, Guaranty held petitioners' investments and financed insurance premiums. After Mount Vernon Surety was formed, Guaranty also received commissions for obtaining clients for that company. [5]
Petitioners were interested in forming their own insurance surety company. In 1969, petitioners, along with a group of investors from St. Louis, formed Mount Vernon Investment Company (Investment), Mr. Vernon Surety Company (Surety), and Mt. Vernon Insurance Agency (Agency). Investment and Surety were both Georgia corporations while Agency was incorporated in Missouri. Petitioners owned a minority of the stock of Investment and the St. Louis investors owned the majority of the stock. Investment in turn owned the majority of the stock of Surety and Agency as well as other investments. Surety was incorporated and licensed in March 1969 to transact insurance business in the State of Georgia. Agency was incorporated in Missouri in 1969 to act *119 as a conduit for Surety business within states other than Georgia. Petitioners ran the day to day operations of Agency and Surety. Surety's business primarily consisted of writing financial guarantee bonds for various individuals and businessess. Shortly after Surety was organized, petitioners sought to obtain reinsurance, that is, insurance to insure the surety bonds which Surety wrote. [6] In this regard, they contacted Interstate Fire Insurance Company (Interstate) of Chattanooga, Tennessee. Initially, Interstate agreed to reinsure Surety for 50 percent of the losses incurred on surety bonds written in Surety's name. [7] In addition, Agency was permitted to write surety (financial guarantee bonds) bonds in Interstate's name for up to $100,000 for each insured or risk. [8] The purpose of this latter agreement was to allow Agency to write surety bonds on Surety's behalf in states other than Georgia, which was the only state in which Surety was licensed to engage in business. Surety agreed to reinsure Interstate 50 percent on surety bonds written by Agency in Interstate's name. *120 On September 29, 1969 Agency entered into an agreement with Old Reliable Fire Insurance Company, (Old Reliable) which allowed Agency to write surety bonds in Old Reliable's name in Missouri up to a maximum limit on one insured or risk of $100,000. Surety agreed to reinsure Old Reliable for 50 percent of the surety bonds written by Agency in Old Reliable's name, and Interstate agreed to reinsure Old Reliable for the other 50 percent. Subsequent to the above agreements, various amendments, agreements and supplemental agreements were entered into between Surety, Agency, Interstate, and Old Reliable. These agreements were governed by the laws of the State of Georgia. As of July 1, 1970, Agency was authorized to write surety bonds in Interstate's name in Alabama, Florida, Georgia, Mississippi, North Carolina, South Carolina, Tennessee, and Virginia, and in Old Reliable's name in Kentucky, Louisiana and Missouri in the maximum amount for each insured or risk of $300,000. The risk of loss on the first of $250,000 was borne 40 percent by Interstate, 30 percent by Old Reliable and 30 percent by Surety. The remaining $50,000 was borne by Old Reliable. [9] However, before Interstate *121 or Old Reliable were liable for any of the losses, Surety was required to cover any losses incurred up to 92-1/2 percent of the premium dollars Surety had received on the bonds. [10]
One type of surety bond written by Surety was a financial guarantee bond. The purpose of this bond was to collateralize loans for borrowers whose collateral, normally real estate, would not be acceptable to the lender. [11] Prior to 1971 Surety and Agency wrote financial guarantee bonds in Interstate's name that were used as collateral security for loans made to third parties by banks and other lending institutions. They received commissions for this service. *122 F. Leland Jones, and attorney-employee of Surety, and Rexford Caruthers, an attorney-stockholder of Investment, both checked the Georgia Insurance Code to determine whether a surety company could issue financial guarantee bonds for the benefit of a related company. Both concluded that such a bond could be written provided that the underwriting standards for the bond and the procedures used with an affiliated company were in strict compliance with the standards and procedures used when dealing with a non-affiliated company. Generally Surety required collateral having a sale value of at least 200 percent of the face amount of the bond. In late 1970 and early 1971, friction developed between petitioners and the St. Louis investors. On March 10, 1971 petitioners entered into an agreement with the other shareholders of Investment to purchase all of the Surety and Agency stock owned by Investment and in return to sell all of their stock *123 in Investment to Investment. Petitioners agreed to pay $675,000 cash for the Surety and Agency stock with the balance of the purchase price being paid for with the stock of Investment transferred by petitioners to Investment. Petitioners were required to make a $25,000 down payment and pay the remaining $650,000 by April 23, 1971, or at the closing if it was later. Petitioners contacted Charles L. Lewis (Lewis), to help them secure the funds to purchase the Surety and Agency stock. [12] It was agreed between petitioners and Lewis that financial guarantee bonds would be used to secure the funds that Lewis would obtain from third party lenders. In March 1971, Lewis, pursuant to his agreement with petitioners, contacted Winston M. Moore, (Moore) of the Third National Bank of Nashville, (Third National) for the purpose of obtaining funds in the name of Hanover Properties, Inc., (Hanover). [13] Although Lewis knew the funds would be used by petitioners, he informed Moore that the funds would be used to develop real estate held by Hanover. On March 31, 1971 Hanover, through Lewis, obtained *124 $250,000 from Third National of which $245,468.75 was deposited in Hanover's account at Third National. The loan from Third National was secured by an Interstate financial guarantee bond in the amount of $250,000 signed on behalf of Interstate by Walsh. [14] Shortly after Hanover obtained the loan, $240,200 of the loan was transferred to Newport Investment Corporation, (Newport), a corporation owned and controlled by Lewis and J. Gary Pyle, (Pyle). On April 20, 1971, a $240,000 certified check was drawn on the account of Newport payable to Guaranty, a corporation owned and controlled by petitioners. Prior to May of 1971 Kreimer had been in contact with Commercial Credit Corporation (Commercial Credit) and had been informed that Commercial Credit would make loans of between $1,000,000 and $2,000,000 guaranteed by Interstate *125 financial guarantee bonds. On May 4, 1971, Pacer Industries (Pacer), another corporation owned and operated by Lewis and Pyle, obtained a loan of $175,000 from Commercial Credit. Pyle informed Commercial Credit that the funds would be used by Pacer. The loan was secured by an Interstate financial guarantee bond in the amount of $175,000 signed on behalf of Interstate by Walsh. On May 7, 1971, Pacer transferred the $175,000 to Guaranty. Subsequent to May 4, 1971, Lewis introduced petitioners to Walter A. Jernigan, (Jernigan), who wished to obtain a financial guarantee bond to secure a loan he was attempting to obtain. Jernigan contacted the First National Bank in St. Petersburg, St. Petersburg, Florida, (First National) to obtain this loan. Subsequently, Kreimer asked Jernigan to obtain an additional loan for petitioners. Jernigan and Kreimer agreed not to advise First National of the purpose of the second loan. On May 6, 1971 Jernigan obtained a $200,000 loan from First National. The loan was secured by an Interstate financial guarantee bond signed on behalf of Interstate by Kreimer. The loan proceeds were then transferred to Guaranty, which deposited the funds in its bank *126 account. Most of the documents for the loan from First National had not been prepared prior to closing. Therefore, Jones attended the closing on May 6, 1971, with Kreimer, for the purpose of preparing the necessary documents. At the closing, Jones learned that the funds from this transaction, as well as the two earlier loans to Hanover and Pacer, were actually received by petitioners. After the meeting, Jones advised Kreimer that the collateral supporting the three loans from which petitioners obtained the funds, should be the same type of collateral as would be taken by Surety in issuing a surety bond to a non-interested person. However, petitioners put up no collateral for any of the three loan transactions. Jones prepared documents whereby Guaranty assumed the loans that had been originally made to Hanover, Pacer, and Jernigan. [17] These documents were signed by Guaranty and delivered to Hanover, Pacer and Jernigan. Jones also prepared various documents to be signed by petitioners in their individual capacities, and by petitioners for Guaranty, to indemnify Interstate, Old Reliable, and Surety in the event Guaranty defaulted on the Loans. However, Jones did not see *127 petitioners sign any of these agreements. At the time petitioners obtained the loan proceeds from Hanover, Pacer and Jernigan, they intended to pay back the loans. Lewis and Jernigan also intended that petitioners pay back the loans. Furthermore, petitioners at the time they obtained the three loans had the ability to repay the loans. The interest on these three loans was paid by Guaranty through July, 1972. On May 10, 1971, petitioners drew a $650,000 check on Guaranty's account to purchase a cashiers check payable to Investment. The cashier's check was used to complete the purchase of the Surety and Agency stock by petitioners. [18]
*128 In 1972, the loans from Third National, Commercial Credit, and First National went into default. Interstate, pursuant to its obligations under the financial guarantee bonds, paid each lender the full amount of the defaulted notes. Petitioners allowed the loans to go into default after Interstate sued them over all the bonds Surety had written in Interstate's name, including the three financial guarantee bonds involved in the instant case. Ultimately, petitioners fully satisfied all their obligations to Interstate with the settlement of their litigation on January 23, 1974. Walsh failed to file income tax returns for 1972 and 1973. On January 26, 1976, petitioners and seven other defendants were indicted in the United States District Court for the Northern District of Georgia for obtaining money under false pretenses and for mail fraud in connection therewith. On February 28, 1978, both petitioners, after trial by jury, were found guilty of four counts of mail fraud, one count of transporting securities obtained by fraud in interstate commerce, and one count of conspiracy to commit those offenses. [19] This conviction was upheld by the United States Court of Appeals for *129 the Fifth Circuit. U.S. v. Kreimer,609 F.2d 126 (5th Cir. 1980). *130 In his statutory notices of deficiency, upon which the instant cases are based, respondent determined that petitioners each received $305,500 by false representations from third parties, which was used for their personal economic benefit and which constituted gross income to them. Respondent also determined that petitioners Stanley E. Kreimer and Harry L. Walsh are liable for the additions to the tax for fraud under I.R.C., section 6653(b). OPINION In order to finance their purchase of the majority stock of Surety and Agency from Investment for $675,000 cash plus other considerations, petitioners employed a scheme to borrow the necessary cash from banks or other lending agencies by using Interstate financial guarantee bonds which they were authorized to issue. Having doubts whether it was lawful for them to issue these surety bonds to secure loans made directly to themselves, and whether Interstate and/or the lending agencies would approve the issuance and use of such bonds as security for such loans, petitioners engaged the services of Lewis and others to disguise the true identity of themselves as the actual borrowers. The scheme was to have Lewis *131 or another party chosen by Lewis apply to the financial institutions for loans to corporate entities which they controlled, have the original loans made in the name of those entities, and then have those entities transfer the funds to petitioners' wholly owned corporation, Guaranty Management Co., Inc., in return for its assumption of the loans and its and petitioners' guarantee of payment of the loans and interest thereon. Interstate financial guarantee bonds were used as the only collateral securing the lending institutions on the original loans, and these bonds were issued by petitioners under powers of attorneys from Interstate. Petitioners normally required the borrower to pledge collateral (such as real estate, stocks, etc.) equal in value to 200% of the face amount of the bond. The lending agencies apparently would not make loans on such collateral because of the illiguidity, the uncertainty of value, and other reasons of their own, but they would make loans secured by Interstate financial guarantee bonds alone. The only three loans with which we are here directly concerned were arranged under this scheme. They were the Third National Bank of Nashville loan of $250,000 *132 to Hanover, which was first transferred to Newport and by Newport to Guaranty; the Commercial Credit loan of $175,000 to Pacer, which Pacer transferred to Guaranty; and a loan of $200,000 which Jernigan obtained from First National Bank of St. Petersburg, Fla, and then transferred to Guaranty. Neither the original borrowers nor Guaranty were required to post the usual collateral for the Interstate bonds used to secure these loans. All of the funds were used by petitioners to pay Investment the cash purchase price for the Surety and Agency stock. The record raises some question as to whether the lenders were told that the ultimate borrowers were petitioners or that the loan proceeds would be used for business purposes of the original borrowers. It is pretty clear from the record, however, that the lending officers were not too concerned about this and made little or no effort to check it out, as long as the Interstate financial guarantee bonds were issued in the full amount of the loans. Nevertheless, it seems clear from the evidence that petitioners used this scheme to prevent either the lenders or Interstate from discovering that they were the ultimate borrowers on the loans collateralized *133 with these bonds. [20]
Interstate apparently became uneasy about the number of bonds issued by petitioners and the amount of potential liability involved, so it cancelled its arrangements with petitioners, Surety and Agency in 1972. Petitioners thereupon ceased paying the interest and principal on the three loans here involved, so the lenders foreclosed the loans and Interstate was required to pay the full face amount of all three loans. Interstate then sued petitioners and their companies on the loans. This suit was settled in early 1974 by petitioners and their companies paying Interstate large amounts in cash and notes to satisfy all their obligations to Interstate. The amounts paid were not allocated to amounts due from specific transactions so we can't tell whether the full amounts due on these three loans were paid; however, the settlement agreement specifically mentioned these three loans and specifically released petitioners and their companies from all obligations thereunder, and Interstate *134 agreed to dismiss the suits instituted for collection thereof. Petitioners, Lewis and others were indicted by a federal grand jury for fraud in obtaining funds under false pretenses and for mail fraud in connection therewith. The jury found petitioners guilty on four counts of mail fraud, one count of transporting securities obtained by fraud in interstate commerce, and one count of conspiracy to commit those offenses; numerous other counts were dismissed. The convictions were affirmed by the Fifth Circuit Court of Appeals, which held that the evidence warranted the conclusion by the jury that, to provide Kreimer and Walsh funding to purchase the outstanding stock of Surety and Agency, Lewis joined in a plan with Kreimer and Walsh to obtain loans totalling $625,000 in the names of other borrowers, obtain financial guarantee bonds on these loans, and divert the proceeds to the use of Kreimer and Walsh. Thus we have a conclusion by a jury, approved by the Fifth Circuit, wherein this case was tried, that the three loans here involved were obtained under false pretenses, which amounted to fraud. We agree that the evidence in this case also supports the conclusion [21] that the *135 loans were obtained under false pretenses. But this is not necessarily conclusive of the tax issue we have before us, which is whether the proceeds of these loans were taxable income to petitioners or were in fact non-taxable loans to petitioners which they intended to, and did, repay. Respondent argues that petitioners' misrepresentation of the loan transactions and the use of the proceeds for their own benefit resulted in the receipt of "gross income" under section 61 of the Code. [21] Petitioners argue that these were bona fide loans which they at all times intended to repay and, in fact, did repay. It is well established that gains from fraudulent or illegal activity can constitute gross income, even though the taxpayer procures his gain under no rightful claim and may have a legal obligation to repay the ill-gotten gain. Rutkin v. United States,343 U.S. 130 (1952); *136 James v. United States,366 U.S. 213 (1961). As the Supreme Court stated in holding that funds obtained by extortion constituted taxable income: An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. That occurs when cash, as here, is delivered by its owner to the taxpaver in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it. Rutkin v. United States,343 U.S. 130, 137 (1952) (citations omitted). Since Rutkin and James v. United States,supra, the courts have found various embezzlers and swindlers to be taxable on the proceeds of their illegal schemes. [22]
However, it is equally well established that gross income does not include loans. James v. United States,supra at 219; United States v. Rochelle,384 F.2d 748, 751 (5th Cir. 1967). *137 As one court stated: "A loan does not in itself constitute income to the borrower, because whatever temporary economic benefit he derives from the use of the funds is offset by the corresponding obligation to repay them." United States v. Rochelle,supra, 751. That a loan does not constitute income, however, does not mean that a taxpayer will be permitted to escape taxation by cloaking an unlawful or fraudulent scheme in the guise of a loan. Whether a transaction constitutes a loan for income tax purposes depends primarily on whether the parties entered into the transaction with the intention that the money advanced be repaid. Commissioner v. Makransky,321 F.2d 598, 600 (3rd Cir. 1963); Moore v. United States,412 F.2d 974, 978 (5th Cir. 1969); Leaf v. Commissioner,33 T.C. 1093, 1096 (1960). In James v. United States,supra, the Supreme Court clarified the income tax treatment of illegal gains, [23] and articulated a test for distinguishing between taxable income and loans. In holding that *138 embezzled funds constituted gross income, the Court stated: When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition,express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." * * * This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. 366 U.S. at 219 (quoting North American Oil Consolidated v. Burnet,286 U.S. 417, 424 (1932)) (emphasis added) (citations omitted). *139 Thus, under James, whether a loan is recognized as such for tax purposes depends on the existence of a "consensual recognition, express or implied, of an obligation to repay." Although the Court in James was concerned with the treatment of embezzled funds, the test has been applied by lower courts to render taxable various illegal or fraudulent schemes purporting to be loans. [24] As we stated in finding a sole shareholder to be taxable on funds withdrawn from his insolvent corporation in contemplation of bankruptcy: "The fact that these diversions were labeled 'loans' * * * is not conclusive of their true character in the absence of any evidence of an intention to make repayment at the time of the taking." Leaf v. Commissioner,supra at 1096. In this case, there is no question that petitioners misrepresented the transactions in order to obtain funds *140 to finance their acquisition of Surety and Agency. Although petitioners, under the complex web of reinsurance agreements between Surety, Interstate, and Old Reliable, had the authority to issue financial guarantee bonds in Interstate's name, it was understood that this power was to be exercised only with respect to commercial loans to third parties which were adequately collateralized. As the record indicates, it is doubtful that Interstate would have permitted petitioners to issue the bonds to secure loans for their own benefit. However, the basic issue in this case is not whether petitioners are guilty of misrepresentation, but whether the proceeds of the loans constitute gross income, [25] and this depends on whether the parties intended that the money be repaid. *141 Respondent cites several cases in which perpetrators of fraudulent schemes were found to have received income under the James test, despite their efforts to structure the transactions as loans. The rationale of these decisions is that the taxpayer's fraudulent conduct vitiated any consensual recognition of an obligation to repay. In United States v. Rochelle,384 F.2d 748 (5th Cir. 1967), the taxpayer induced numerous people to "invest" in various bogus ventures. He represented himself as a promoter of many highly profitable businesses, none of which existed. His "almost magnetic powers in presenting his promotion schemes" persuaded many investors to "loan" him money with an expectation that they would acquire a part interest in the enterprise and realize substantial profits. The taxpayer used the funds for his personal benefit without restriction; in fact, they constituted the sole source of income to support his lavish life-style. He ultimately became bankrupt. In holding that the funds constituted gross income, the court stated: "Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the *142 transaction becomes a 'wrongful appropriation [and comes] within the broad sweep of gross income'." 384 F. 2d at 751 (quoting James v. United States,supra at 219). See also United States v. Swallow,511 F.2d 514 (10th Cir. 1975). In United States v. Rosenthal,470 F.2d 837 (2nd Cir. 1972), the taxpayer, among other illegal activities, fraudulently obtained loans from banks by misrepresenting his net worth and posting worthless collateral. He incurred obligations that were far in excess of his ability to repay. The court sustained the jury's finding that the taxpayer did not intend to repay the loans, and therefore, received income. The court noted: "On the evidence, the defendant could be treated as one in the business of fraudulently deriving funds, in the form of loans, from financial institutions." 470 F.2d at 842. In McSpadden v. Commissioner,50 T.C. 478 (1968), the taxpayer devised a scheme to obtain money from finance companies by selling bogus chattel mortgages on nonexistent farm equipment. The taxpayer persuaded various farmers to "purchase" the equipment from a company controlled *143 by the taxpayer, and then "lease" the equipment to the taxpayer. The farmers were led to believe that the taxpayer used the equipment in his farming operations, but in fact none of the equipment existed. The farmers signed purchase contracts, promissory notes, and chattel mortgages, and received ten percent of the mortgage proceeds in exchange for their role in the scheme. [26] The taxpayer then discounted the mortgages with the finance companies. He used the proceeds to enlarge his grain storage business, part of the income from which was used to make payments on the bogus mortgages. The taxpayer ultimately pleaded guilty to criminal charges related to the scheme. The taxpayer in McSpadden contended that the proceeds from the scheme were received as loans. We found the proceeds to be taxable as "proceeds of fraud," and stated that the transactions "did not either in form or in substance result in McSpadden's incurring a debt obligation other than the general obligation *144 of a person who defrauds another to make restitution to the person defrauded." [27]50 T.C. at 488. The payments made by the taxpayer on the mortgages did not transform the scheme into a debt obligation, but rather "were the ordinary and necessary expense of perpetrating and concealing the fraud." 50 T.C. at 489. In a separate case arising out of the same fraudulent scheme as McSpadden, another taxpayer was found to have received income. Moore v. United States,412 F.2d 974 (5th Cir. 1969). As in McSpadden, the Fifth Circuit concluded that the relationship between the taxpayer and the finance companies that purchased the bogus mortgages was not even in form that of debtor-creditor. The court stated: Though he made regular payments and may have intended that one day the finance companies would be reimbursed in full, we cannot say that the good intention of a swindler whose identity is unknown to the party from *145 whom the money is being obtained is the same in law and in fact as a consensual loan arrangement between two parties * * * … In these circumstances, there is still an absence of an agreement between the actual lender and borrower entailing "consensual recognition" of an obligation to repay and exact conditions of repayment. Estes had a legal obligation to make full restitution, but he did not have a hard-and-fast agreement with the finance companies to do so. 412 F.2d at 979-980. The import of these cases is that, where fraudulent conduct evinces the absence of a bona fide intent to repay, no loan exists and the perpetrator is taxed accordingly on his ill-gotten gain. Respondent argues that these decisions require a finding of gross income in this case.However, other than outlining in detail the specifics of petitioners' complicated loan transactions, respondent offers few facts in support of his contention that petitioner did not intend to repay the loans. As we stated above, a finding of fraudulent conduct does not in itself establish a lack of intent to repay. *146 We are convinced, viewing the record as a whole, that petitioners intended at all times to repay these loans, did in fact repay them, and cannot be held to have received income from these transactions. The loans must be viewed in the context of the intricate reinsurance agreements between Surety, Interstate, and Old Reliable. Although Interstate was primarily liable to the lenders, because the guarantee bonds were issued under its name, any ultimate losses on the loans would be apportioned among the parties according to the agreements. When the loans went into default in 1972, Interstate paid the banks in full. [28] The litigation between petitioners and Interstate was settled in 1974, with the payment by petitioners to Interstate of cash, notes and other property. [29] The settlement satisfied the petitioners' liability on all bonds issued in Interstate's name.Thus, there is no evidence that anyone lost anything on these loans. Respondent's bald assertion that petitioners did not repay the funds is contrary to the record. [30]
*147 While petitioners misrepresented the nature of the loans in order to avoid scrutiny by either the lenders or Interstate, in every respect they treated the obligations as bona fide debt. The loans were assumed by Guaranty pursuant to written agreements, [31] and in addition, indemnification agreements were prepared. [32] Petitioners paid interest on the loans. It also appears that petitioners had a sufficient net worth and cash flow from their business to repay the loans. In addition, the testimony of all witnesses indicates that petitioners at all times intended to repay the loans. Respondent concedes that the factual patterns in Rochelle,Rosenthal, and Swallow differ from the factual pattern in this case. Indeed, petitioners' conduct bears little similarity to the fraudulent *148 schemes in those cases. Each of those cases involved a consistent pattern of fraudulent dealing which demonstrated unequivocally that the perpetrators had no intent to repay the ill-gotten funds. The superficial labelling of the transactions as loans was ineffectual where the taxpayers' conduct vitiated any "consensual recognition of an obligation to repay." James v. United States,supra.In this case, petitioners, who enjoyed a good reputation in their field, misrepresented the identity of the ultimate borrower on the loans in order to finance their acquisition of the Surety and Agency stock and thereby develop their own business. Despite the impropriety of their conduct, we think that petitioners intended to repay these loans; their business depended on it. The cases cited by respondent are simply inapposite to the underlying business purpose of the loans in this case. Although not cited by either party, Moore v. United States,supra, while factually quite dissimilar to this case, contains language which may suggest a broader reading of the words "consensual recognition of an obligation to repay" contained in James. While finding, *149 as did this Court in McSpadden, that the bogus mortgage scheme lacked even the form of a loan between the taxpayer and the finance companies, the court stated: In these circumstances, there is still an absence of an agreement between the actual lender and borrower entailing "consensual recognition" of an obligation to repay and exact conditions of repayment… [t]he absence of a consensual agreement between the party providing the money and the party receiving it is fatal to the Trustee's contention that the money should be excluded from gross income on a loan theory.
412 F.2d at 980 (emphasis added). In this case, there was obviously no agreement between the lenders and Guaranty, whose identity as the true borrower was not revealed by petitioners or Lewis. If the above language from Moore is taken literally, this absence of a specific consensual agreement between the actual lender and the actual borrower would be fatal to petitioners' argument. Under our holding in Golsen v. Commissioner,54 T.C. 742, aff'd on another issue, 445 F.2d 985 (10th Cir. 1971), cert. denied, 404 U.S. 940 (1971), we are required *150 to follow Moore to the extent it controls in this case. We do not think that Moore requires a decision for the respondent. In that case, there was no debtor-creditor relationship, even superficially, between the taxpayer and the purchasers of the bogus mortgages. The finance companies bought the rights to nonexistent obligations, and the taxpayer was not himself liable on the false mortgages. This fraudulent scheme was in substance no different than those in Rochelle and Swallow. The absence of any consensual recognition of an obligation to repay in the above cases is evident from the fraudulent conduct itself. In Moore, however, the taxpayer argued that the totality of the circumstances, particularly the agreements between the taxpayer and the farmers who "purchased" the nonexistent equipment, in effect created a loan agreement between the taxpayer and the finance companies. However, the essence of Rutkin and James is that the general obligation of one who defrauds another to make restitution is not sufficient to negate the receipt of gross income. As the Fifth Circuit observed: Despite the forcefulness with which this argument has been made, *151 we are unable to assimilate the arrangements between Estes and the farmers to loan agreements between Estes and the finance companies. Though he made regular payments and may have intended that one day the finance companies would be reimbursed in full, we cannot say that the good intention of a swindler whose identity is unknown to the party from whom the money is being obtained is the same in law and in fact as a consensual loan arrangement between two parties. 412 F.2d at 979. Thus, when considered in the context of its facts, the language in Moore is consistent with our finding here that petitioners received proceeds from bona fide loans, and not "proceeds of a fraud." McSpadden v. Commissioner,50 T.C. 488. The fact that the actual lenders were not aware of the identity of the true borrower is not significant in light of the reinsurance agreements between the parties. The lenders relied solely on Interstate's bond to secure the loan; Interstate relied on its agreement with Surety. The factors we discussed above reveal a "consensual recognition" of all parties involved that these loans would be repaid, despite the fact that the lenders *152 and Interstate were unaware of petitioners' diversion of the loan proceeds to their own use. [33] We think that any broader reading of the language in James would be unwarranted on the basis of the facts of that case and all subsequent decisions which have considered the issue. In summary, we think that the respondent in this case has relied too much on the fact of petitioners' improper conduct and too little on the effect of that conduct. The picture that emerges from the record is not one of swindlers or embezzlers of the type found in James or its progeny; rather, it is one of a legitimate (albeit highly risky) enterprise whose owners, for reasons not entirely clear, felt compelled to resort to misrepresentations *153 in order to obtain necessary financing. Petitioners apparently assumed that, by paying off the loans, the impropriety of their use of Interstate's bonds would never surface. Unfortunately, Interstate's growing concern about the highly risky financial guarantee bond business resulted in an examination that revealed the scheme. The petitioners have "paid the price" of their indiscretion in the form of criminal convictions, repayment of the funds, and, presumably, the loss of their business. We think that respondent's effort to add an income tax deficiency on top of these misfortunes must fail. In the notices of deficiency respondent asserted the additions to tax for fraud against Stanley Kreimer and Walsh; the notice of deficiency stated that the addition to tax for fraud does not apply to Betty J. Kreimer. Although we have concluded that petitioners did not receive unreported income from the three bonding transactions discussed above, petitioners have conceded that other adjustments in the notices of deficiency increasing their incomes for the years involved were correct. Therefore, the fraud issue is still involved. *154 Respondent has the burden of proving fraud by clear and convincing evidence; that a part of the deficiency is due to fraud with intent to evade tax. Papineau v. Commissioner,28 T.C. 54, 57 (1957). Respondent has relied entirely on petitioners' conduct relative to the three loans and their omissions of income as a result thereof to prove fraud. He offered no evidence that any part of the deficiencies other than that arising out of those transactions was due to fraud. Since we have concluded that petitioners did not omit taxable income as a result of those transactions, that part of the deficiencies based on those purported omissions are rejected. Consequently, respondent has failed to carry his burden of proving that any part of the deficiencies was due to fraud. We hold for petitioners on the fraud issue. Due to concessions Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect for the taxable years in issue.↩
2. At trial and in brief, petitioners conceded all the other determinations made by respondent in the notice of deficiency except those raised herein. ↩
3. Respondent has determined that petitioner, Betty J. Kreimer, is not liable for the addition to tax for fraud. Betty is a petitioner solely by reason of filing a joint return with Stanley F. Kreimer.↩
4. Petitioners Stanley E. Kreimer and Harry L. Walsh are sometimes herein collectively referred to as petitioners.↩
5. Some of these commissions may have been received from clients of Surety for writing financial guarantee bonds for them.↩
6. The reinsurance obtained by Surety simply allowed Surety to share with other insurance companies the risk of loss on financial guarantee bonds that it wrote. ↩
7. Thus, if Surety were required to pay the debt or obligation of the insured, Interstate agreed to reinsure Surety for 50% of that loss. Kreimer and Walsh were given powers of attorney to enable them to write bonds in Interstate's name. ↩
8. The company in whose name the surety bond was written, in this case, Interstate, was liable to the public.↩
9. These agreements only allocated the loss between Interstate, Old Reliable and Surety. The surety company in whose name the surety bond was written remained liable to the public. ↩
10. In other words, if Surety received premiums of $1.0 million and incurred losses on the surety bonds it wrote of $2.0 million, Surety would first have to pay 92-1/2% of its earned premiums to cover the loss, or $925,000 dollars. Then, the various applicable loss percentages would be used to determine the extent of Interstate's, Old Reliable's and Surety's loss.↩
11. The financial guarantee bonds written by Surety simply promised the person to whom it was issued, usually a lender, that if the borrower, or obligor failed to repay the debt or obligation owed, Surety would pay such debt or obligation.↩
12. Petitioners agreed to pay Lewis $25,000 for his assistance in obtaining the funds.↩
13. Although Lewis signed a bank signature card as President of Hanover, he testified that he did not think he was an officer of Hanover at that time. ↩
14. Moore stated that Third National would not have lent the $250,000 to Hanover if it had known that the funds were going to Kreimer and Walsh since they were benefiting personally from Interstate's guaranty.↩
17. These documents prepared by Jones were dated as of the date the various loans were obtained by petitioners. (March 31, 1971 for the Hanover loan, May 4, 1971 for the Pacer loan, and May 6, 1971 for the Jernigan loan). Jones was not told by either petitioner to back date the documents and did so on his own volition.↩
18. The Surety and Agency stock was originally shown as an asset on the books and records of Guaranty. However, this was later changed by adjusting entries for fiscal year ended February 28, 1972 which reclassified the asset from an investment to loan receivables from petitioners.↩
19. Count one of the indictment charged petitioners with: … unlawfully, willfully and knowingly devised and attempted to devise a scheme and artifice to defraud Interstate Fire Insurance Company (Interstate), Chattanooga, Tennessee, and Old Reliable Fire Insurance Company (Old Reliable) St. Louis, Missouri, as well as various banks and other lending institutions… and to obtain money and property from said victims by means of false and fraudulent pretenses, representations, promises, and omissions, well knowing that said pretenses, representations, and promises were and would be false when made, and said omissions were and would be material…. Counts two and three related to petitioners placing a letter in the mail addressed to Commercial Credit containing a loan application in furtherance of their scheme to defraud the bank. Count three related to documents placed in the mail that were sent to First National in furtherance of the scheme to defraud First National. The indictments covered not only the three transactions here involved but numerous other transactions between petitioners, Surety and other bonding and lending institutions.↩
20. It also appears that petitioners required some borrowers to pay an extra commission to Guaranty for issuance of bonds, which commissions were not reported to Interstate.↩
21. The transcript of most of the evidence in the criminal trial was stipulated as a part of the record in this case.↩
21. The transcript of most of the evidence in the criminal trial was stipulated as a part of the record in this case.↩
22. See Breckenridge v. Commissioner,T.C. Memo 1983-66↩, and cases cited therein.
23. Prior to the Supreme Court's decision in James v. United States,366 U.S. 213 (1961), there was authority for the proposition that proceeds from illegal or fraudulent activity, such as embezzlement, do not constitute taxable income because of the absence of any bona fide legal or equitable claim to the money, and the existence of an obligation to make restitution. James v. United States expressly overruled Commissioner v. Wilcox,327 U.S. 404↩ (1946), on this issue.
24. See, e.g., United States v. Rochelle,384 F.2d 748 (5th Cir. 1967); United States v. Rosenthal,470 F.2d 837 (2d Cir. 1972); United States v. Swallow,511 F.2d 514 (10th Cir. 1975); Leaf v. Commissioner,33 T.C. 1093↩ (1960).
25. In their briefs, both petitioner and respondent devote much of their discussion to the question of whether petitioners' conduct with respect to these transactions was fraudulent. To a large extent, this misses the point. Whether the loan proceeds constitute income depends on whether the parties entered into the transaction with the intent that the money be repaid. While the existence of fraud is certainly relevant to this issue, we do not think that it alone is dispositive, as we explain below. Nor do we think that whether or not petitioners' conduct violated Georgia insurance law is conclusive of the Federal income tax issue before us.↩
26. The rental payments from the taxpayer equalled the payments the farmers made on the mortgages, and the taxpayer made these payments for about two years until the scheme collapsed and he became bankrupt.↩
27. We also observed that McSpadden's position was even weaker than that of the taxpayer in Rochelle,↩ because he did not incur even a false debt obligation; McSpadden himself was not obligated on the mortgages.
28. The record does not reveal exactly how much Interstate paid on the loans in issue. Petitioners paid interest on the loans, but it is not clear whether the principal was reduced. ↩
29. The dispute between Interstate and Surety concerned the entire relationship between the companies, and was triggered by Interstate's apprehension about the growing number of financial guarantee bonds in general, rather than by any knowledge of these specific loans. ↩
30. This is not to suggest that the fact of repayment in itself establishes the requisite intent to repay at the outset of the transaction. An embezzler who later makes restitution when his hand is caught in the till nevertheless receives income at the time of the theft. See Leaf v. Commissioner,supra,↩ at 1096. In this case, however, the repayment was made pursuant to the agreement between Interstate and Surety, and in a general sense was contemplated by the parties at the outset of these transactions.
31. It appears that the assumption agreements were executed subsequent to the transfer of the loan proceeds to Guaranty, but this does not alter their legal effect.↩
32. It is not clear that these indemnities were signed by petitioners. However, these agreements were superfluous in light of Surety's obligations under the reinsurance agreements, and the assumption of the loans by Guaranty.↩
33. Moreover, given the intricate network of reinsurance agreements, Interstate, rather than the financial institutions, may be accurately viewed as the "lender" here. Interstate had an unqualified obligation to honor its bond; the financial institutions (barring Interstate's insolvency) bore no risk. Clearly there is a "consensual recognition of an obligation to repay" as between Interstate and Surety; reinsurance is based upon such interlocking obligations.↩