AUGUSTO P. RODRIGUEZ AND MARGARITA RODRIGUEZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rodriguez v. Commissioner
Docket No. 26369-83.
United States Tax Court
T.C. Memo 1986-8; 1986 Tax Ct. Memo LEXIS 600; 51 T.C.M. (CCH) 243; T.C.M. (RIA) 86008; January 8, 1986. Luis Medina, for the petitioners. Claudine Ryce, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Addition to Tax
Sec. 6653(b),
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
I.R.C. 1954
1976
$ 96,493.00
$48,247.00
1977
$108,883.00
$54,441.50
1978
$144,940.00
$72,470.00
1979
$ 12,953.14
$648
*601 The issues for decision are as follows: 1. Whether respondent erred in his determination of petitioners' taxable income for 1976, 1977, and 1978 by using the net worth increase and nondeductible expenditures method of income reconstruction; 2. Whether any part of the underpayment of petitioners' income tax for 1976, 1977, and 1978 was due to fraud within the meaning of section 6653(b), [1] and 3. Whether any part of petitioners' underpayment of tax for 1979 was due to negligence or intentional disregard of the tax laws within the meaning of section 6653(a). FINDINGS OF FACT 1. General
Petitioners Augusto P. Rodriguez (hereinafter petitioner) and Margarita Rodriguez (sometimes hereinafter referred to as Margarita or petitioner's spouse), husband and wife, were legal residents of Miami, Florida, when they filed their petition. They filed joint Federal income tax returns for 1975 through 1979, reporting all income and deductions on the cash receipts and disbursements method of accounting. Petitioner was born in 1934 in Cuba and lived in that country until *602 late 1968, when he moved to Madrid, Spain. Petitioner remained in Spain for approximately 2-1/2 years. He then entered the United States at Miami, Florida, as a resident alien. He and his present wife, Margarita, have three children. He became a United States citizen in 1976 and Margarita became a citizen in 1978. 2. Organization of Almacen El Espanol
As a result of the severance of diplomatic relations between the United States and Cuba, United States residents were not permitted to send money, clothing, medicine, or other items to friends or relatives in Cuba. Moreover, Cuban residents were not permitted to fly directly to the United States. On his arrival in the United States from Spain in 1971, petitioner began a business, which continued through the years here in controversy, under the name Almacen El Espanol. The business involved primarily the preparation and processing of the legal paperwork for persons who wished to leave Cuba either by way of Spain or Jamaica for permanent or temporary stays in the United States. In addition, the business involved the freight forwarding of medicine, clothing, and other items to Cuba via Spain, Mexico, or Canada. Petitioner *603 received referrals of potential customers from affiliates in several locations in the United States, including New Jersey, Illinois, California, and Maryland. Petitioner had the business incorporated on April 8, 1976, under the name of Almacen El Espanol, Inc. (Almacen or the corporation). The corporation adopted a fiscal year ending April 30. For the fiscal years ended April 30, 1977, and April 30, 1978, Almacen reported its income as a regular or subchapter C corporation. For the fiscal year ended April 30, 1979, Almacen was taxable as a subchapter S corporation and its stock was owned by petitioner with 60 percent, Margarita with 20 percent, and Carmen Ordenes, petitioner's daughter from a prior marriage, with 20 percent. Petitioner made all the business decisions. For its services during 1976, 1977, and 1978, Almacen charged fees of $59 to send money to individuals in Cuba for the purchase of airline tickets. Almacen also charged substantial fees for shipping to Cuba packages of clothing, medicine, and other articles. It charged its customers fees of $175 per person for doing the paperwork necessary to bring people to the United States for visits. To be permitted to *604 land in Jamaica on the way to the United States, the Cubans were required to have at least $300 in cash. Almacen collected deposits of the required cash from its customers to cover the Jamaican entry fees and charged a fee of $59 for the transmittal and delivery of each $300 to Jamaica. 3. The Corporate and the Customer Deposits Bank Accounts
When Almacen was organized, petitioner's accountant, Ruben Garcia (Garcia), suggested that the corporate receipts should be deposited into two separate accounts. In one account (hereinafter the corporate account), [2] the fees for services would be deposited, and the corporation would include these amounts in its gross income. In the other account (hereinafter the customer deposits account) [3] the customer deposits of funds received for transmittal to Jamaica would be placed. Funds deposited in this account were to be held as nontaxable trust funds. During 1976, 1977, and 1978, Almacen *605 maintained a corporate bank account at the Sun Bank of Miami. [4] In this corporate account, Almacen deposited most of the fees that it received from its customers for its services and drew checks on the account to cover Almacen's payroll and other expenses. The deposits in this corporate account and the checks drawn on it were used as the basis for computing Almacen's taxable income for income tax purposes. During 1976, 1977, and 1978, petitioners maintained in their own names the customer deposits account at the Sun Bank of Miami, No. 20-522-0. In this account, petitioner placed most of the funds received from customers for transmittal to Jamaica for use in enabling friends and relatives (clients) of Almacen's customers to land in Jamaica on their way to this country. In some instances, petitioner deposited in this account fees received from customers for sending packages to Cuba, thereby diverting to this account fees which, under the accounting system recommended by Garcia, should have been treated as corporate income. Petitioners did *606 not pay taxes on deposits in this account. In other instances, Margarita deposited in her personal accounts or that of her minor daughter, Twinky, checks payable to Almacen as fees or deposits. Some of the individuals for whom deposits were made did not enter the United States through Jamaica. The receipt form used by Almacen for the deposits did not indicate that a refund of deposited amounts would be made in any circumstances. When a customer demanded a refund, it was made but usually in a discounted amount, purportedly on account of the devaluation of the Jamaican dollar even though the money remained in the United States at all times; the discounts averaged approximately 20 percent. No interest was paid on any refunds. No refunds were made unless they were demanded. Petitioners did not return to Almacen the deposits for which refund claims were not made or pay to Almacen the interest earned on the moneys on deposit. [5] Petitioners did not show on financial statements made during 1976, 1977, and 1978 any liability for repayment of deposits to either Almacen or to customers. *607 4. The Jamaica Bank Account
In addition to the corporate account and the customer deposits account, petitioner, during 1977, 1978, and 1979, maintained in his own name an account, No. 302-78-2, with the Bank of Nova Scotia in Jamaica (sometimes hereafter referred to as the Jamaica account). Into this account, he regularly deposited sums withdrawn from the customer deposit account. The funds in the Jamaica account were available for use in enabling clients to meet the Jamaican $300 landing requirements. The total deposits in the Jamaica account were as follows: Year
Amount
1976
$433,968.89 1977
$309,763.38 1978
$832,502.56.
The Jamaican dollar was devalued on the following dates so that it took more than one Jamaican dollar to buy an American dollar: Date
Jamaican Dollars to Buy American Dollar
4/25/77
1.248125
10/22/77
1.278125
1/14/78
1.348125
5/ 8/78
1.5475  6/ 8/78
1.571250
7/13/78
1.594375
8/11/78
1.61875 The amounts of the deposits in the Jamaica account exceeded the sums needed by Almacen to qualify Cuban clients to land in Jamaica. Even before the first devaluation of the Jamaican dollar *608 in April 1977, petitioner regularly cleared the account of excess funds. After the first devaluation, he gave the Bank of Nova Scotia orders to transfer to him personally, on a monthly basis, all funds in the Jamaica account in excess of $4,000. The withdrawals of funds were not necessarily made at the end of the month. Petitioner decided what was to be done with the excess deposits withdrawn from the Jamaica account and returned to him. Substantial amounts of the withdrawals were used to make personal investments in such items as bank certificates of deposit in his and Margarita's names and to purchase real estate or other property. The Internal Revenue Service (IRS) agents were unable to trace any funds withdrawn from the Jamaica account that were redeposited in the customer deposit account. The IRS agents were able to trace funds withdrawn from the Jamaica account and used by petitioner to purchase bank certificates of deposit in the names of petitioner and Margarita as follows: 1. On March 11, 1976, petitioner withdrew $25,000 (American) from the Jamaica account and on March 29, 1976, purchased a $25,000 certificate of deposit (no. 3529) from the Sun Bank of Miami. *609 2. On June 29, 1976, petitioner withdrew $40,000 (American) from the Jamaica account and on July 2, 1976, purchased a $40,000 certificate of deposit from Republic National Bank of Miami (no. 7640). 3. On August 23, 1976, petitioner withdrew $38,355.16 (American) from the Jamaica account and on September 1, 1976, purchased a $38,356.16 certificate of deposit from AmeriFirst Bank in Miami (no. 71-00026469-9). 4. On September 22, 1976, petitioner withdrew $30,000 (American) from the Jamaica account and on September 27, 1976, purchased a $30,000 certificate of deposit from Sun Bank of Miami. By letters dated February 1, 1979, March 1, 1979, and April 2, 1979, the Bank of Nova Scotia transmitted to petitioner drafts in the respective amounts of $108,796.13, $90,243.45, and $141,169.21, "per standing instructions on file." The examining revenue agent was unable to document the balance of the Jamaica account as of December 31, 1978. He estimated the balance by averaging the amounts of the drafts transmitted to petitioner by the bank with those letters. 5. Personal Bank Accounts
In addition to the bank accounts described above, petitioners maintained other personal bank *610 accounts for themselves and their minor daughter, Twinky. They failed to report as income on their returns substantial amounts of interest earned on these accounts. During 1976, 1977, and 1978, Almacen's funds were used to cash employee payroll checks, and the employees' checks were then deposited in Margarita's personal bank accounts at Continental Bank and Republic National Bank and that of their daughter in Republic National Bank. Customers' checks for fees as well as customers' checks for deposits and currency were also placed in these personal accounts. The following table summarizes those deposits in Margarita's accounts and that of their daughter: 1976
1977
1978
Continental - 060-602-7
Customers' checks
$19,419.93
Employees' checks
7,073.09
$1,683.96
Cash
24,991.50
Republic - 032-945-4
Customers' checks
$19,475.60
Employees' checks
10,194.03
5,502.43
Cash
200.00
Republic - 330-958-4
Customers' checks
3,423.50
10,775.89
Employees' checks
5,074.77
11,077.42
Cash
6,407.00
51,800.00
Total
$51,484.52
$26,983.26
$98,631.34
6. Application of Net Worth Income Reconstruction Method
On their income *611 tax returns for 1975 through 1979 petitioners reported the following amounts of adjusted gross income: Year
Adjusted Gross Income
1975
$33,542.01
1976
$31,072.29
1977
$26,730.51
1978
$34,218.01
1979
$65,067.95
The accountant, Garcia, prepared petitioners' Federal income tax returns for 1976 through 1979. Petitioners provided him with summary information on their income, deductions, and credits rather than underlying documents. Respondent redetermined petitioners' income for 1976, 1977, and 1978 by use of the net worth increase and personal expenditures method of income reconstruction. As of December 31, 1975, petitioners' net worth was $8,220.46, computed as follows: Cash on hand
$ 500.00
Automobile--Buick Regal
5,000.00
Continental Bank 060-602-7
1,031.06
Bank of Nova Scotia
589.00
Sun Bank 41-792-7
1,100.40
Total net worth
$8,220.46
From their arrival in the United States through the end of the calendar year 1979, petitioners received no gifts, inheritances, pensions, loans, or other income derived from nontaxable sources, other than certain mortgages on real estate and two loans from Julio Rodriguez in 1978. These loans *612 and mortgages were taken into consideration in computing petitioners' net worth for 1976, 1977, and 1978 as set forth below. The following table summarizes petitioners' assets and liabilities and net worth increases for 1976, 1977, and 1978: Item
1975
1976
1977
1978
Cash on hand
$ 500.00
$ 500.00
$ 500.00
$ 500.00
Cash in banks
2,720.46
152,567.20
244,223.60
[1] 301,494.19
Real estate
and other
assets [2]
5,000.00
152,541.00
365,445.50
679,591.66
Total
assets
$8,220.46
$305,608.20
$610,169.10
$981,585.85
Less: Liabilities
89,656.00
175,824.00
272,572.15
Net
Worth
$8,220.46
$215,952.20
$434,345.10
$709,013.70
8,220.46
215,952.20
434,345.10
Increase in
Net Worth
$207,731.74
$218,392.90
$274,668.60
*613 Petitioners' living expenses, income tax payments, and social security payments in 1976, 1977, and 1978 totaled $6,160.05, $34,191.49, and $40,832.47, respectively. The parties are in agreement with respect to the foregoing increases in net worth in every respect except two items: [6] (1) The balance in the Jamaica account as of December 31, 1978, and (2) whether petitioners' liabilities should include the amounts of the customer deposits that had been received and not used or refunded by petitioner as of the ends of each of the years in controversy. 7. Negligence Issue for 1979
Because Almacen became a subchapter S corporation for its fiscal year ended April 30, 1979, its taxable income for that fiscal year was reflected (to the extent of 80 percent) in petitioners' joint income tax return for 1979. Several items of personal expense were paid from the corporate account and deducted in computing the income *614 passed through Almacen to petitioners. Thus, on September 26, 1978, the Almacen account was used to pay premiums totaling $3,000 on life insurance policies on the lives of petitioners. On September 27, 1978, a check on Almacen's account for $14,619.93 was used to purchase an automobile in petitioner's name. Repair bills of $1,000 for petitioners' automobile were paid by Almacen on August 4, 1978, and deducted as a utility expense. On its fiscal year 1979 return, Almacen deducted reserves of $40,000 which the corporation set up as a bookkeeping credit for the repayment of fees in case the corporation was unable to provide the services. OPINION 1. The Deficiencies Issue
On examination of a taxpayer's return, the Commissioner may use the net worth increase method of reconstructing income to test the accuracy and completeness of the taxpayer's books and records. See, e.g., Schwarzkopf v. Commissioner,246 F.2d 731, 743 (3d Cir. 1957), affg. a Memorandum Opinion of this Court; Vloutis v. United States,219 F.2d 782, 786-787 (5th Cir. 1955); see *615 generally Holland v. United States,348 U.S. 121 (1954). If the test discloses unreported income, the Commissioner may use that method to determine deficiencies in the taxpayer's income. The taxpayer then has the burden of proving that the Commissioner's determinations are erroneous. Welch v. Helvering,290 U.S. 111 (1933); Webb v. Commissioner,394 F.2d 366, 372 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. In the instant case, respondent determined the substantial net worth increases and the deficiencies described above. Petitioners have stipulated to the accuracy of the figures underlying the net worth increases on which the determined deficiencies are based in every respect except two: (1) The balance in petitioner's account in the Bank of Nova Scotia as of December 31, 1978, and (2) respondent's failure to treat as a liability for each year an asserted obligation on the part of petitioner to refund sums deposited with Almacen by its customers but not refunded to the customer or used for Almacen's business purposes. The Bank of Nova Scotia records on the December 31, 1978, balance in petitioner's account *616 were not obtainable, according to petitioner, during the audit of petitioners' returns or at the trial. Although petitioner was subpoenaed to produce them, he testified that, because he had closed his account at the bank and the bank in Jamaica did not efficiently keep its records for prior years, he was unable to obtain the requested records. It is necessary, therefore, to estimate the balance in the account at the end of 1978. The $113,403 figure used by respondent is the average of the amounts returned to petitioner by the bank with letters dated February 1, 1979, March 1, 1979, and April 2, 1979. These letters were sent pursuant to petitioner's instructions to clear the account monthly of funds in excess of $4,000. Petitioner contends that, as reflected by the dates of the transmittal letters, the account was cleared of excess funds at the end of each month and that the correct balance as of December 31, 1978, was thus $4,000. Petitioner's $4,000 figure is not an acceptable estimate of the account's balance on December 31, 1978. Bank ledger sheets show that the Bank of Nova Scotia account was not cleared of excess funds at the ends of 6 other months in 1977 and 7 other *617 months in 1978, the only months for which ledger sheets are available; in those months the account was reduced to $4,000 (or thereabouts) on other dates, ranging from the second day to the twenty-ninth day of the particular month. Further, the letters relied upon by petitioner reflect that the drafts used to transmit the excess funds were mailed from the bank in Jamaica to petitioner in Miami. Even if petitioner is correct that the Jamaica account was reduced to $4,000 on December 31, 1978, the inference is that the draft was in the mail to petitioner in Miami on that date and would be properly includable in petitioner's net worth as an asset at the end of 1978. Petitioner has not pointed to any 1978 (or other) deposit in a Miami bank that represents the proceeds of such a draft. We find that petitioner has not carried his burden of proof on this issue. As to petitioner's liability to customers for the deposits, he contends that customers paid Almacen sums of money, parts of which were fees for services to be performed by Almacen and other parts were deposits designed to enable individuals entering the United States to meet the $300 Jamaican landing requirements. The fees portions *618 of the payments, petitioner asserts, were deposited in the corporation's bank accounts and reported by Almacen as income. The deposits portions of the payments, on the other hand, were placed in petitioner's customer deposits account. Petitioner argues that he become an escrow agent of the customers and Almacen with respect to the deposited sums and was liable to the customers and Almacen to carry out the purposes for which the deposits were made and to reimburse any losses that might arise from the relationship, citing Tucker v. Dr. P. Phillips Co.,139 F.2d 601 (5th Cir. 1943); Armbruster v. Alvin,437 So.2d 725 (Fla. Dist. Ct. App. 1983). The amount of petitioner's obligation to Almacen and the customers with respect to the deposits, he argues, should, therefore, be applied to reduce the net worth increases determined by respondent. We do not agree. The bank account in which petitioners placed these deposited amounts was neither designated nor treated as an escrow or fiduciary account. Instead, petitioner in his own testimony described the account as representing "the money of the customers that I deposit in my account." The accountant *619 who prepared the tax returns of Almacen and petitioners for years after 1975 testified that the account was "in their [petitioners'] name and they treated it as theirs." The parties stipulated on the record that "the monies in the accounts actually belong to Mr. and Mrs. Rodriguez." And petitioner directly or indirectly used the money deposited in the account to make many of the personal investments described in our findings which, to a large extent, explain the increases in his net worth at the rate of more than $200,000 for each of the years in controversy. As we view the evidence, petitioner used his control over Almacen and his dealings with its customers to divert to himself money which he was free to, and did, use and dispose of at will. From such use of the money, petitioner obtained readily realizable economic value in the form of investments in real estate and other property and certificates of bank deposits in his and his spouse's own names. These benefits from the diverted funds are sufficient to bring the funds within the broad sweep of gross income as defined in section 61. The fact that he refunded some of the diverted funds in no way relieves him of tax on the *620 funds in kept. United States v. Rosenthal,470 F.2d 837, 842 (2d Cir. 1972); Davis v. United States,226 F.2d 331, 334 (6th Cir. 1955); Leaf v. Commissioner,33 T.C. 1093, 1096 (1960), affd. 295 F.2d 503 (6th Cir. 1961); see also Stovall v. Commissioner,762 F.2d 891 (11th Cir. 1985), affg. a Memorandum Opinion of this Court. The possibility that petitioner may eventually be called upon to refund some of the deposits does not relieve him of tax on them in the year he diverted them to his own use. In North American Oil v. Burnet,286 U.S. 417 (1932), an oil company received income from oil properties in receivership in 1917, but its right to such income was not resolved until 1922, the year in which litigation affecting the fund was closed. The Court explained (286 U.S. at 424): If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed *621 that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * * If in 1922 the Government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. [Citations omitted.] [7]
Similarly, petitioner personally received the customer deposits during 1976, 1977, and 1978, treated them as his own and used them for his own purposes, without restriction. The deposits were taxable to him when he received them even though he was later called upon to refund a portion of them and may be asked for further refunds. The net worth increase computation, in effect, gives petitioner a deduction for any refunds made in the years in controversy in that the refunded amounts did not increase petitioner's net worth as of the ends of those years. The same conclusion would be called for it, as he contends, petitioner received the funds from Almacen and its *622 customers as escrow agent. His conversion of such funds to his own use in those circumstances would be akin to embezzlement of trust funds, and it is now well established that embezzled funds are taxable income. As explained in James v. United States,366 U.S. 213, 219 (1961): When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." * * * In such case, the taxpayer has "actual command over the property taxed--the actual benefit for which the tax is paid." * * * This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. * * * [Citations omitted.] See also, e.g., Moore v. United States,412 F.2d 974, 979-980 (5th Cir. 1969); McSpadden v. Commissioner,50 T.C. 478, 488-489 (1968). *623 There is no evidence supporting an argument that there was a "consensual recognition" by petitioner and the customers of an obligation to refund deposits not used by Almacen clients for entries through Jamaica. The record does not contain any agreement by petitioner with Almacen or its customers obligating petitioner to make refunds or informing customers that they could claim refunds. In fact, the receipt form issued to customers contains nothing even suggesting a possible refund. From the testimony it is clear, as we have found to be the fact, that refunds were made only to customers who demanded them; if a customer did not demand a refund, he did not get one. Petitioner's financial statements prepared during the relevant period do not list as a liability any obligations to make refunds of deposits. We are convinced that many customers did not have even the slightest inkling that they could have had any of their deposits refunded to them in any circumstances. The mere possibility that demands may eventually be made for refunds, or that petitioner has an obligation to make requested refunds, does not relieve him of tax on the diverted funds. United States v. Rosenthal,470 F.2d at 842; *624 Quinn v. Commissioner,524 F.2d 617, 625 (7th Cir. 1975), affg. 62 T.C. 223 (1974); Leaf v. Commissioner,33 T.C. at 1096. 2. The Fraud Issue
Section 6653(b) provides for the imposition of a 50-percent addition to tax if any part of any underpayment of tax is "due to fraud." Under this statute, fraud is established if it is shown by clear and convincing evidence that the taxpayer intended to evade taxes believed to be owing by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004-1005 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968); affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The burden of showing fraud by clear and convincing evidence rests with respondent. Sec. 7454. Respondent has made the requisite showing. The record shows, as we have discussed, that petitioner in 1976, 1977, and 1978 increased his net worth to *625 the extent of more than $200,000 per year mainly by diverting Almacen's corporate funds to his own use. In those same years, he reported adjusted gross income of less than $35,000 per year, and the parties have stipulated that petitioner's nondeductible expenditures for living expenses, social security payments, and income tax payments exceeded those amounts of reported adjusted gross income in 2 of the 3 years. Petitioner is a highly intelligent individual and an astute businessman. We are convinced that he knew that he was not reporting all of his taxable income in those years and that he intended to evade taxes on the unreported amounts. This substantial understatement of income in successive years may be taken as evidence of fraud. Schwarzkopf v. Commissioner,246 F.2d at 734. As explained in our findings, petitioner's accountant recommended that Almacen maintain two bank accounts, one for fees and one for deposits in order to segregate the taxable fees from the nontaxable deposits. The reason for the segregation, we are convinced, was made clear. Yet petitioner's spouse regularly deposited in her personal checking accounts and that of a daughter customer *626 checks that had been received by Almacen to cover customers' fees as well as deposits. In addition, Almacen cashed its payroll checks with corporate funds and petitioner's spouse then deposited the payroll checks in her personal checking accounts, thus siphoning money out of Almacen. We find that these substantial diversions of corporate funds to petitioners' personal accounts were carried out in this manner with the purpose and design of avoiding income tax on those amounts. In a variety of other ways petitioners received earnings which were not reported as income. Petitioners retained the excess of customer deposits over the amounts refunded in cases in which refunds were made. Thousands of dollars of the deposits were not refunded. The deposited sums drew interest for petitioners at the banks. The full amount of the interest earned on certificates of deposits and savings accounts was not reported as income. In the absence of any other adequate explanation, we think these maneuvers were designed to evade taxes known to be owing on those accretions to petitioner's wealth. The manner in which petitioner handled the Bank of Nova Scotia account reveals a further effort to evade *627 taxes on their income. They used the Jamaica account to "launder" substantial amounts of customer deposits so that they could not be easily traced when they were returned to the United States. Petitioner frequently transmitted to the Bank of Nova Scotia sums far in excess of the amounts needed to enable clients arriving from Cuba to meet the $300 Jamaican entry requirements. Petitioner was unable to give a satisfactory explanation of why he made those excess deposits. The excess funds were then cleared from the account by drafts payable to petitioner. The IRS was unable to trace any such drafts back into the customer deposits account and petitioner pointed to none. Our findings lists four withdrawals of funds from the Bank of Nova Scotia account which the IRS traced directly to the purchases in 1976 of certificates of deposit totaling over $130,000. In addition to these four traced deposits, other amounts were used to purchase in petitioners' names certificates of deposit and real estate. We think the practice of making and then withdrawing excess deposits from the Jamaica account was designed to conceal the use of customer deposits for making personal investments. Petitioners *628 did not maintain books and records which disclosed the above-described diversions of corporate income to their own use. They thus provided their income tax return preparer as well as the IRS agents with incomplete and misleading records. The IRS agents were compelled to develop many of the facts set forth in our findings through painstaking investigation. The evidence is clear, as we view it, that petitioners attempted to defeat the payment of income tax on substantial amounts of their income. We find that respondent has carried his burden of proof that a substantial part of petitioners' underpayment of tax was due to fraud within the meaning of section 6653(b). 3. The Negligence Issue
Section 6653(a) provides for the imposition of a 5-percent addition to tax if any part of an underpayment is due to negligence or intentional disregard of the rules. The burden of proof as to this addition to tax rests with petitioner. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972); Rosano v. Commissioner,46 T.C. 681, 688 (1966). To support his determination, *629 respondent cites the following items, all of which relate to the income of Almacen, the subchapter S corporation, the income of which was passed to petitioners: Almacen deducted $14,619.93 paid for an automobile registered in petitioner's name; Almacen deducted $3,000 for the premium on personally owned life insurance on the lives of petitioners; Almacen deducted $1,000 for the repair of petitioner's automobile; and Almacen deducted $40,000 as reserves for a contingent liability to repay fees in case the corporation was unable to perform the services which it had contracted to perform. Petitioners have not contested the disallowance of deductions for those items but they have offered no evidence to explain how they came to make the mistakes. Petitioner was president and manager and Margarita was treasurer and bookkeeper of Almacen. She supplied information to the accountant who prepared their returns. They are thus responsible for the errors leading to these mistakes. The IRS investigation of petitioners' 1976, 1977, and 1978 returns was under way when petitioners filed their 1979 return. Quite obviously, they had taken some steps to correct to some extent their income tax recordkeeping *630 and reporting shortcomings, but we have no evidence as to how these 1979 errors occurred or as to the care they took to avoid negligent underreporting of their income. Because the burden of proof on this issue rests on petitioners, we must sustain the section 6653(a) addition to tax. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. This account is referred to in the record by various names: general account, general operating account. ↩
3. This account is referred to in the record by various names: deposit account, special account, escrow account, and reimbursement account.↩
4. From the beginning of 1976 to Nov. 3 of that year, the account was designated number 417927 and was thereafter designated as 014349.↩
5. Petitioner made two calculations of the amounts of deposits not refunded to customers, one calculation in 1980 and another in 1985, when the case was tried. No satisfactory explanation is given for the differing amounts which are as follows: ↩
1980 Calculation
1985 Calculation
1976
$ 43,700
$147,050
1977
$ 67,000
$195,591
1978
$122,400
$354,300
1. Petitioner contends that the amount included in this figure and related ones for the balance in the account at the Bank of Nova Scotia should be not more than $4,000 rather than $113,403 included under the above computations. The "Cash in banks" here shown includes the balances in six accounts in 1976 and eight accounts in 1977 and 1978. ↩
2. The assets included in these amounts include investment in numerous pieces of real estate, automobiles, stock, individual retirement accounts, furniture, and jewelry.↩
6. In addition, petitioners' requested finding includes as an asset only $500 for jewelry for 1976 whereas it is stipulated, as pointed out by respondent, that the correct figure is $5,000. We assume that petitioners' error in the requested finding was inadvertent.↩
7. The rule for handling deductions for amounts received under a claim of right and subsequently restored is now prescribed by sec. 1341, et seq.↩