IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 16-60270

United States Court of Appeals
Fifth Circuit

**FILED**

January 18, 2018

Lyle W. Cayce
Clerk

JERRY J. SUN; SUN NAM SUN,

Petitioners - Appellants

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee

Appeal from the Decision of the
United States Tax Court

Before DAVIS, CLEMENT, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

A friend from overseas sent Jerry Sun and a company Sun controlled about $19 million to invest. Sun used almost $6 million for personal expenses. Another $4 million was kept in the accounts of Sun's company. The remaining $9 million or so was invested, but it was held in brokerage accounts in Sun's name, mingled with his other funds, and the gains or losses were reported on Sun's taxes. The tax court held a trial to determine the appropriate tax treatment of the $19 million. It considered various theories. Sun argued the money was a loan, which would mean he did not owe taxes on it. The IRS argued he did owe taxes upon receipt of the money as income from a foreign company or, for the money that passed through Sun's company, as qualified

No. 16-60270

dividends.  The court also considered whether the transfer was a gift.  In the end, it did not agree with any of these theories.  The tax court concluded that the money was not a tax-free loan.  It also found that it was not income to Sun when he received it because it was being entrusted to Sun to invest on his friend's behalf.  But the court concluded that Sun diverted the funds for his personal benefit, at which time the money became taxable.  Whether this misappropriation finding was a correct characterization is the primary issue we consider.

I.

Sun, an American citizen, is the sole shareholder and chief executive officer of Minchem International, Inc., a Texas corporation that imports minerals from China.  Sometime before 2008, he and his good friend Bill Cheung, a Chinese citizen, agreed that Cheung would entrust funds to Sun to invest in the United States.

The arrangement was oral.  Both Sun and Cheung testified that Sun had broad discretion regarding how to invest the funds and that the funds were for investment purposes.  But they differed on many details.  Sun testified that he was to invest the money for at least five years, whereas Cheung maintained it was for seven or ten years.  As to Cheung's return on investment, Sun said he and Cheung agreed to split any profits beyond a ten percent return.  Cheung, on the other hand, asserted that Sun was obligated to pay him a ten to fifteen percent annual return.

Of the $19 million Cheung sent between 2008 and 2009, almost $15 million was sent to Minchem's officer loan account.  This account was listed on the company's general ledger but was solely for Sun's benefit.  The remaining $4 million was sent to Sun's personal brokerage accounts or Sun Investment, LLC, a partnership in which Sun owns a 99-percent interest.

No. 16-60270

As noted, Sun ended up using millions of Cheung's money for personal expenses. This included the purchase of a luxury car, payment of the mortgage and real estate taxes on his home, and—the biggest category—over $5 million for gambling which resulted in losses of about $2.1 million. The $4 million that remained in Minchem's officer loan account increased Minchem's working capital, which bolstered its creditworthiness when the company sought a line of credit. The remaining $9 million of Cheung's money was invested through either Sun's brokerage accounts or Sun Investment. This money was mixed with Sun's personal fund, there was no separate accounting of Cheung's performance, and Sun reported the gains, losses, and dividends from the accounts on his own taxes.

Cheung testified, somewhat cryptically, that he may have been aware Sun was using some of his money for personal purposes. When first asked whether he knew this was the case, Cheung replied, "I do know." He then said, "Well, whether he used this amount of money – let me put it this way. I know he was gambling. Is that what your question is?" Unsatisfied with Cheung's response, counsel repeated the question. Cheung replied, "How did I put this way? That when he lost money in Vegas he had telephoned me and told me that. That whether he lost my money or used my money and then he lost it or used his money, well, let me say that I did not know. I did not know how he divided or how he distribute his money to be put in."

After examining Sun's and Minchem's 2008 and 2009 returns, the IRS issued a notice of deficiency. The notice set out alternative theories for the tax treatment of Cheung's transfers. According to the first, funds sent to Sun through Minchem were gross receipts to Minchem and then dividend distributions to Sun (meaning both Minchem and Sun owed taxes on this money); funds sent directly to Sun were taxable upon receipt as income from a foreign company. The second theory asserted that Minchem was merely a

No. 16-60270

conduit and thus all funds should be included in Sun's gross income. The notice also assessed fraud penalties or, in the alternative, the less onerous accuracy-related penalties for Sun's failure to report Cheung's transfers as income.

In addition to claiming that the money from Cheung was taxable, the notice also alleged that Sun underpaid taxes by (1) failing to report as income travel and entertainment expenses paid by Minchem, and (2) incorrectly claiming an investment interest deduction. The basis for the deduction was interest paid on a home equity loan obtained by Sun; the loan proceeds were deposited into Minchem's bank account. Minchem's ledger lists the transaction as a personal loan from Sun to Minchem. The IRS contended this did not constitute a legitimate investment. These other two tax issues are only relevant to this appeal because of the negligence penalties the court imposed that Sun challenges. He does not challenge the tax court's agreement with the IRS about the underlying tax treatment of these transactions.

As it is in this appeal, the primary dispute in the tax court concerned the biggest dollar item: the $19 million Cheung sent Sun. Sun argued that the money was a loan because Sun was obligated to repay it. The tax court rejected this contention, noting there was not a loan agreement, a security interest, a fixed term for repayment, or agreed rate of interest. But the tax court also disagreed with the IRS's position that Cheung's transfer of funds to Sun was taxable upon receipt. This was because the tax court determined that Sun held the funds in trust to invest for Cheung's benefit. But the money later became taxable because Sun "misappropriated the funds for personal use, abandoned the intended purpose for which the money was entrusted, and he did not invest the money in accordance with the agreed-upon strategy." Such misappropriated funds are income. Although the court did not impose fraud penalties, it did find that negligence penalties were warranted for Sun's failure to report Cheung's funds as income and for the other alleged deficiencies.

4

No. 16-60270

The tax court's misappropriation theory required a recalculation of the tax and penalties listed in the deficiency notice. Recall that the IRS's primary theory was that money sent directly to Sun was taxable as income but the money sent through Minchem was taxable only as dividends. Because dividends are subject to lower rate than income, the finding that all of the Cheung transfer was income would increase Sun's tax liability from $3.9 to $6.7 million (though Sun and Minchem combined would face less overall tax liability as the funds that passed through Minchem would not be subject to double taxation at both the corporate and individual level). As a result of the tax court's finding that all of the Cheung transfer was income to Sun, the IRS moved for leave to amend its answer to conform to the proof at trial and assert a greater deficiency amount for Sun's personal liability. Sun opposed the motion as both untimely and prejudicial. The tax court granted the motion and allowed the amendment. The parties thereafter agreed that the new computations were correct.

Sun appeals. With respect to the Cheung funds, he challenges the conclusion that they are income as well as the negligence penalties assessed. Those penalties are the only aspects he challenges of the other deficiencies the tax court found. Finally, he challenges the tax court's decision allowing the IRS to file an amended complaint that recalculated the amounts owed.

II.

Gross income is broadly defined to include "all income from whatever source derived." I.R.C. § 61(a). Although at one time the Supreme Court took a different position, *see Commissioner v. Wilcox*, 327 U.S. 404, 408 (1946), it has long been the case that income includes funds acquired through embezzlement or misappropriation. *James v. United States*, 366 U.S. 213, 219 (1961). So if a stockbroker does not invest his client's money but instead takes it to Vegas and loses it at the blackjack table, then the broker is not only liable

5

for theft but also owes taxes on the money used for personal gain.  *See, e.g.*, *Sproul v. Commissioner*, T.C. Memo 1995-207, 1995 WL 292386, at \*5-6 (May 15, 1995).  Sun argues this does not describe his relationship with Cheung because he was obligated to repay the money whether the investments succeeded or failed.  He also argues that his independent wealth gave him the means to repay the money despite his spending much of it (though there is no evidence that he did give any money back to Cheung).  A bona fide mutual obligation to repay would prevent treating the Cheung funds as being misappropriated because the first requirement of such a finding is that there be no "consensual recognition, express or implied, of an obligation to repay." *James*, 366 U.S. at 219.  The second requirement is that there be no restriction on how the money is used.  *Id.*

Sun contends the tax court failed to make the first required finding: that there was no consensual recognition of an obligation to repay.  More than that, he says, it made the following finding that supports the opposite conclusion:

> While the specific terms of the agreement between Mr. Cheung and Mr. Sun were not defined, both credibly testified that Mr. Sun was obligated to return some money to Mr. Cheung at some point.  Thus, the transfers were not from detached and disinterested generosity because Mr. Cheung expected some return of money from Mr. Sun.

This discussion was part of the tax court's explanation of why the funds were not a gift from Cheung to Sun; he expected to get some money back.

An obligation to "return some money at some point" is not, however, inconsistent with misappropriation.  Cheung's expectation of some return is typical for the type of varied investments Sun was supposed to make.  For all but the riskiest of investments, an investor with a diversified portfolio expects to get some money back even if the investments do not turn out well.  But that does not mean the recipient of the funds is allowed to make personal use of the

6

money. And when the holder of the funds uses the money to enrich himself, he has received "economic value," which is the defining characteristic of income. *James*, 366 U.S. at 219 (citation omitted); *see also Rutkin v. United States*, 343 U.S. 130, 137 (1952) ("An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.").

A vague understanding that some money will be returned at some undefined time is not the mutual recognition of an agreement to repay in full that *James* contemplates. *James* explains the work the requirement of no "consensual recognition . . . of an obligation to repay" is doing: the "standard brings wrongful appropriations within the broad sweep of 'gross income'; *it excludes loans*." *James*, 366 U.S. at 219 (emphasis added). It was necessary to draw this line because loan proceeds are not taxable. The reason is that although a loan provides money to the borrower that can be used for temporary economic gain, it is offset by a future obligation to repay. *United States v. Rochelle*, 384 F.2d 748, 751 (5th Cir. 1967) (Wisdom, J.). As there is no overall improvement in the borrower's economic situation, there is no gain to be taxed. *Id.* This contrasts with the taxable treatment of embezzled or misappropriated funds. *James*, 366 U.S. at 219. A leading tax treatise calls this the "theft-loan dichotomy" that *James*'s "no consensual recognition of an obligation to repay" requirement seeks to enforce. B. Bittker & L. Lokken, FEDERAL TAXATION OF INCOME, ESTATES AND GIFTS ¶ 6.4, p. 4 (3d ed. 2017). Our court and others have also recognized that the *James* language is ensuring that loans are not treated as taxable income.[1] *Moore v. United States*, 412 F.2d 974, 979–80 (5th

---

[1] History explains this concern. Prior to *James*, embezzled funds were not treated as income because there was a legal obligation to repay (the thief would owe restitution to the victim). *See Wilcox*, 327 U.S. at 408–09. Relying on the same principle of an offsetting obligation that prevents loans from being treated as income to this day, *Wilcox* generally treated any obligation to repay—whatever the source of that obligation—as preventing an

No. 16-60270

Cir. 1969); *see also Buff v. Commissioner*, 496 F.2d 847, 848 (2d Cir. 1974) (explaining that "the lack of consensual recognition of an obligation to repay" element of *James* "distinguish[es] embezzlement from a loan"); *Webb v. Commissioner*, 823 F. Supp. 29, 32 (D. Mass. 1993) (recognizing that "*James*'s 'consensual recognition' standard" serves to "distinguish bona fide loans from other transactions"). And the Supreme Court held that refundable security deposits paid to a utility were not income to the company because they are more akin to loans than to advance payments. *Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203, 207–12 (1990) (analogizing refundable deposits to the proceeds of a commercial loan because there is a "guarantee" of repayment).

This understanding that the "consensual recognition" language from *James* is about loans defeats Sun's reliance on it. That is because the tax court made a detailed and definitive finding that Cheung did not loan the money to Sun. Or, in the words of *Indianapolis Power*, there was no "guarantee" of full repayment. 493 U.S. at 210. The court noted that there was no written loan agreement, Sun did not provide any collateral, and the parties did not agree on the timing or amount of repayment. These things are expected of most loans,

income classification. *Id.*; *see also* Bittker & Lokken*, ¶ 6.4. *James* overruled *Wilcox* in holding that embezzled or misappropriated funds are income. *James*, 366 U.S. at 219, 221. But it wanted to continue excluding loan proceeds—that is, money transferred with a consensual obligation to repay as opposed to an obligation imposed by law—from income. *Id.* at 219–20; *Collins v. Commissioner*, 3 F.3d 625, 632 (2d Cir. 1993) (explaining that "the Supreme Court has clearly abandoned the pre-*James* view and ruled instead that only a loan, with its attendant *'consensual recognition'* of the obligation to repay, is not taxable" (emphasis in original)). In contrast to this treatment of loans, courts have consistently held in other situations that money is income when a taxpayer makes personal use of it despite a legal obligation repay. A lawyer who misuses funds held in trust for clients is an example. *See Bailey v. Commissioner*, 103 T.C.M. 1499 (2012), *aff'd sub nom, Bailey v. I.R.S.*, 2014 WL 1422580 (1st Cir. Mar. 14, 2014); *In re Carmel*, 134 B.R. 890, 896–97 (Bankr. N.D. Ill. 1991). Although there is an obligation to repay and personal use of the funds in both a loan and embezzlement situation, eventual repayment is much more likely in the loan scenario as they are often collateralized and usually issued only to those who are creditworthy.

No. 16-60270

let alone one for close to $20 million. The tax court's express finding that Cheung did not loan the money to Sun thus satisfies the first *James* requirement. That the tax court later credited Sun's and Cheung's testimony that there was an obligation to return some unspecified amount of money on some unspecified occasion is not inconsistent with its refusal to treat the transfers as a loan.[2] We have recognized this distinction between a bona fide loan that remains nontaxable under *James* and vague promises to repay that do not prevent a finding of misappropriation. *Moore*, 412 F.2d at 978 ("As opposed to unlawful economic gains which must be reported as income, the proceeds from a *bona fide* loan do not constitute income because whatever temporary economic benefit the borrower derives from the use of the funds is offset by a corresponding obligation to repay them." (emphasis added)); *Collins v. Commissioner*, 3 F.3d 625, 631 (2d Cir. 1993) ("Loans are identified by the mutual understanding between the borrower and lender of the obligation to repay and a *bona fide* intent on the borrower's part to repay the acquired funds."); *see also Illinois Power Co. v. Commissioner*, 792 F.2d 683, 689 (7th Cir. 1986) ("The underlying principle is that the taxpayer is allowed to exclude from his income money received under an *unequivocal* contractual . . . duty to repay it, so that he really is just the custodian of the money." (emphasis added)). A legitimate loan should have "exact conditions of repayment" as part of a "hard-and-fast agreement." *Moore*, 412 F.2d at 980. Even with documented agreements to repay, courts have found they are not bona fide examples of loans within the meaning of *James* when the chances of full

---

[2] The only way to reconcile the express finding of "no loan" with the tax court's later brief mention of an obligation that some money would be repaid is that the latter was not a formal agreement to repay the full amount. Any remaining doubt about this is resolved when the tax court later (in assessing a negligence penalty) describes the arrangement as an "*un-agreed-upon* obligation to repay the money."

repayment are unrealistic,[3] *Buff*, 496 F.2d at 849 (finding it "wholly unrealistic" to believe an employee could pay back $22,000 embezzled from his employer in $25 weekly payments), or when a violation of the terms of the loan undermines the credibility of an intention to repay, *Webb*, 823 F. Supp. at 33 (treating as income funds falsely obtained from a Small Business Administration disaster relief loan). A mutual understanding that Sun would "return some money to Mr. Cheung at some point" is thus not enough to constitute the bona fide loan that would allow Sun to avoid reporting as income the millions he used to gamble, to bolster the financial condition of his company, and to produce investment returns that he retained and commingled with his other funds.

An understanding that some, but not necessarily all, of Cheung's money would be returned is thus not typical of either a gift or a loan, as the tax court found. The former would not have an expectation of a return; the latter would require it in full. Sun's obligation to someday return some money instead characterizes the investment relationship that we previously described. Indeed, this is how Sun described his role: he "was entrusted with funds belonging to another for investment purposes – much like a custodian." Another word the law sometimes uses to describe custodians is trustee. *See, e.g.*, 11 U.S.C. § 101(11) (defining custodian in the bankruptcy code to include, among other things, trustees holding property of the debtor). Yet Sun also challenges the tax court's ruling on the ground that there was no formal trust

---

[3] That full repayment is the standard reinforces the distinction between a loan and an understanding that Sun would "return some money to Mr. Cheung at some point." Partial repayment is not a bona fide loan. As discussed above, it instead characterizes the typical investment relationship in which the funds are held in trust on the investor's behalf who is entitled to a return of the funds with the resulting gains or losses. Sun emphasizes some of the testimony that Cheung was guaranteed a full return of his money plus a positive return, but the tax court did not credit that testimony given the lack of documentation and inconsistent testimony about any guarantee.

relationship between him and Cheung, so there could be no misappropriation. We see no support in the caselaw requiring the existence of a formal trust relationship before funds diverted to personal use can be classified as income. Neither *James* nor our cases applying it mention such a requirement. *James*, 366 U.S. at 219–20; *Moore*, 412 F.2d at 978–80. Judge Posner rejected a trust requirement, explaining that it should not make a "difference . . . whether the money is placed in a formal trust or is merely ordered held for the benefit of others." *Illinois Power*, 792 F.2d at 688. The key is whether the money is no longer being used to benefit the other person but rather in a way that results in "economic value" to the taxpayer. *James*, 366 U.S. at 219. That is why the "law is settled that funds diverted to one's own use constitute taxable income." *Potito v. Commissioner*, 534 F.2d 49, 51 (5th Cir. 1976). The uses to which Sun was putting Cheung's millions that we have already recounted amply support the tax court's finding that Sun was realizing an economic benefit from the money.[4] We affirm the finding that the money became income to Sun when he diverted it for his personal use.

## III.

Sun next challenges the penalties the tax court imposed not just for the failure to include Cheung's money as income but also for failing to include Minchem's payment of personal expenses as income and for improperly claiming an investment interest deduction. The tax court rejected the IRS's attempt to impose fraud penalties, but did impose the 20% penalties that results from "[n]egligence or disregard of rules or regulations." I.R.C. § 6662(a), (b). The standard of review largely dictates the outcome of this challenge as

---

[4] It does not matter that, as Sun emphasizes, Cheung did not object when he apparently realized Sun was using money for unintended purposes like gambling. The money was entrusted to Sun for investing on Cheung's behalf. Once he spent it on his own behalf instead, he realized the economic gain that constitutes income.

we can vacate the tax court's finding of negligence, and its related finding that Sun did not establish a defense of good faith, only if clear error is shown. *Streber v. Commissioner,* 138 F.3d 216, 219 (5th Cir. 1998); *see Todd v. Commissioner*, 486 F. App'x. 423, 427 (5th Cir. 2012).

Negligence is strongly indicated when a taxpayer fails to ascertain the correctness of an exclusion or deduction that would seem to a reasonable person to be "too good to be true." 26 C.F.R. § 1.6662-3(b)(1). The tax court was entitled to find that was the case for the $19 million Cheung sent from China. Sun did not inquire into the implications of using this enormous sum of money for personal expenses without reporting it to the IRS. The same is true for Sun's attempt to deduct interest he owed on a home equity loan as investment interest or not to report the travel and entertainment expenses Minchem covered. Because a reasonable person could see the beneficial tax treatment of these transactions as "too good to be true" and Sun did not inquire about the tax consequences, we are not left with a firm conviction the tax court made a mistake in finding Sun was negligent. *See Pasternak v. Commissioner*, 990 F.2d 893, 903 (6th Cir. 1993) (holding that a prudent person would investigate claims when they are likely "too good to be true").

Although Sun did not seek any specific advice about treatment of the contested tax issues, he nonetheless contends that he is entitled to the defense of good faith reliance because accountants prepared his returns. *Cf. United States v. Boyle*, 469 U.S. 241, 251 (1985) (explaining that taxpayer may avoid negligence penalty if he reasonably relied on expert's advice). But merely turning over financial documents to an accountant is not enough to establish a good faith defense. *Todd*, 486 F. App'x. at 427. It is also again a problem for Sun that he did not inquire about the unusual and high-dollar transactions at issue. *See Westbrook v. Commissioner*, 68 F.3d 868, 881 (5th Cir. 1995); *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 100 (2000), *aff'd*, 299

F.3d 221 (3d Cir. 2002). Sun directed his accountant to ask Minchem's CFO any questions, but that employee testified that he was not fully aware of the Cheung-Sun arrangement. And there was no documentation of the terms for the accountants or CFO to consult because the agreement was oral. Sun has not shown the complete disclosure of relevant facts to his accountants that would compel a good faith defense. *Contrast Streber,* 138 F.3d at 219–22 (reversing a finding of negligence when taxpayer provided tax lawyer with all relevant information, sought advice on how to classify funds, elected to report the income consistent with option lawyer approved). We will not disturb the tax court's conclusion that Sun did not establish the defense.

IV.

The final question is whether the tax court erred in allowing the IRS to recompute the amount of the deficiency after the tax court ruled that all the Cheung money was income to Sun (as opposed to part of it being income to Sun and the funds that were sent to Minchem being taxed first at the corporate level and then treated as dividends on Sun's return). The tax court has "jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency . . . if claim therefor is asserted by the Secretary at or before the hearing or a rehearing." I.R.C. § 6214(a). Courts have construed this provision broadly, concluding that "there is no reason why the word 'hearing' should not be given a significance broad enough to include the whole proceeding down to the final decision." *Hennigsen v. Commissioner*, 243 F.2d 954, 959 (4th Cir. 1957) (allowing amendment after testimony concluded when taxpayer testified he received a bonus in a different year than the one the IRS listed in its notice); *cf. H.F. Campbell Co. v. Commissioner*, 443 F.2d 965, 970 (6th Cir. 1971) (rejecting argument that "course of the trial" in a tax court rule is limited to the "period in which testimony is taken" and concluding that it "include[s] all

proceedings down to final judgment"). This ensures that the tax imposed by the tax court is consistent with its liability ruling. *Commissioner v. Ray*, 88 F.2d 891, 893 (7th Cir. 1937) (explaining that it is sometimes the case that "[u]ntil the liability is determined neither taxpayer nor Commissioner is in a position to make a computation"). Just as a civil proceeding in district court is not complete until damages have been determined and final judgment entered, a tax "hearing is not completed until these computations are made." *Id.* Further support for this broad reading of "hearing" is found in the statute's allowing an amended notice to be filed at or before rehearing. Rehearing would necessarily follow the hearing. *Helvering v. Edison Secs. Corp.*, 78 F.2d 85, 90–91 (4th Cir. 1935) (recognizing that the statue allows amended notices even after entry of judgment because of the rehearing language). We therefore conclude that the tax court had jurisdiction to consider the amended notice that was filed during the computation phase before entry of final judgment.

The existence of jurisdiction under section 6214(a) means only that the tax court could allow the amended notice, not that it was required to do so. *See Commissioner v. Erie Forge Co.*, 167 F.2d 71, 76–78 (3d Cir. 1948) (recognizing this difference in concluding that tax court did not abuse its discretion in declining to allow IRS to seek new penalties after conclusion of testimony). So Sun also challenges the district court's decision to allow the amendment under Tax Court Rule 41(a). Similar to the civil rule governing amendment of complaints, Rule 41(a) says that "leave shall be freely given when justice so requires." TAX CT. R. 41(a).

The tax court did not abuse its discretion in allowing the IRS to amend its notice. Without the new computation there would have been an untenable situation in which the amount owed was not consistent with the proper tax treatment of the transactions. There is no dispute about the accuracy of the recalculation. And the "new" amount due based on all the Cheung money being

No. 16-60270

treated as income to Sun was the same amount that would have been due under the IRS's alternative theory that was listed in the original notice. That theory treated Minchem as solely a conduit so that the entire $19 million was income to Sun. Sun thus had notice from the beginning of the proceeding that the liability ultimately imposed was his potential exposure.[5]

Given that the recomputed amount could not have been a surprise to him, Sun seeks to identify a lack of notice based on the misappropriation theory's being raised *sua sponte* by the tax court. But that liability finding did not flow from the court's allowing the amended notice; the timing was the other way around as the liability finding prompted the request for a new computation. If Sun thought he lacked notice of the misappropriation theory, he could have attacked the underlying liability ruling on that basis either in a request for rehearing or in this appeal. But lack of notice is not one of the challenges he raises to the misappropriation finding. And in at least two ways the misappropriation theory was better for Sun than the IRS's primary theory. For one thing, it resulted in less overall taxation for Sun and his company because it avoided the double taxation of the money going through Minchem. For another, to the extent he ever repays any of the money as he says was the plan, Sun can deduct that amount for the tax years in which those transfers occur.

**\* \* \***

The judgment of the tax court is AFFIRMED.

---

[5] To the extent some courts have also considered the jurisdictional question under section 6214(a) as turning in part on notice concerns, *see Helvering*, 78 F.2d at 91, the IRS's alternative theory in the original notice satisfies these concerns.

15