T.C. Memo. 2018-64

UNITED STATES TAX COURT

RB-1 INVESTMENT PARTNERS, ERIC REINHART, TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22674-04.            Filed May 14, 2018.


<u>Kyle R. Coleman</u>, for petitioner.

<u>Richard J. Hassebrock</u>, <u>Gary R. Shuler, Jr.</u>, <u>Nancy B. Herbert</u>, and <u>Robin L. Herrell</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>: The Reinhart brothers made a fortune when they sold their family concrete business in 2000, but the sale threatened a hefty tax liability.

[*2] The brothers chose to enter a Son-of-BOSS[1] deal to manufacture tax losses to offset their gains.  They concede the deal doesn't work, and now contest only the applicability of an accuracy-related penalty that the Commissioner says they owe.

FINDINGS OF FACT

I.    Selling the Concrete Business

The Reinhart family's success in business began with the patriarch of the family, Paul Reinhart, Sr., who worked for companies that made cement, a component of concrete.  Mr. Reinhart started out in 1969 at The Western Company, which mixed concrete.  While there, he worked with trucks that mixed concrete in made-to-order batches.  These trucks can be more efficient than a traditional drum truck because specific quantities of concrete can be mixed on site with less waste.  Mr. Reinhart saw a business opportunity in these "concrete-mobiles."  So, when the Western Company sold its research division in 1971, he

---

[1] Son of BOSS is a variation of a slightly older alleged tax shelter known as BOSS, an acronym for "bond and options sales strategy."  There are a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership.  See, e.g., Logan Tr. v. Commissioner, 616 F. App'x 426, 428 (D.C. Cir. 2015), aff'g in part, rev'g in part, and remanding Tigers Eye Trading, LLC v. Commissioner, 138 T.C. 67 (2012); Superior Trading, LLC v. Commissioner, 137 T.C. 70, 72 (2011), aff'd, 728 F.3d 676 (7th Cir. 2013).

**[*3]** and some others bought a couple of the trucks and Custom-Crete, Inc. (Custom-Crete), was born.

Within just a few years Custom-Crete's excellent reputation solidified. In 1975 Mr. Reinhart bought out his partners. He wanted a family business, but his two sons--Eric and Doug Reinhart--had both joined the Navy.

Eric graduated from Annapolis in 1977 with a degree in naval architecture. He explained that his "boat-building degree" was "sort of like aerospace engineering" for boats; he didn't take any accounting or tax classes at the Naval Academy. Doug went to Texas A&M University on a Navy ROTC scholarship, and he graduated in 1978 with a degree in business administration. Eric flew planes in the Navy; Doug served on board a frigate. They both helped protect the country's coast during the Cold War, and may even have tracked the same Soviet submarines at the same time--Eric from the sky and Doug from the sea.

When Eric left the Navy in 1984, he had to decide between life as a commercial pilot or working for his dad. He picked his dad, and went to work for Custom-Crete in Dallas as an assistant shop manager. Doug had already left the Navy a couple years earlier; he also joined the family business. Eric and Doug played important roles in the company's growth between the early 1980s and the

**[\*4]** early 1990s--Eric on the concrete side and Doug on the newer decorative-stone side.

Things changed in the early 1990s. Mr. Reinhart was diagnosed with colon cancer and felt unfit to continue as president. Eric stepped into that role in 1992. The company that Eric took over differed greatly from the one that his dad had started just two decades earlier.

Custom-Crete had gone from one location in Dallas back in 1971 to offices in Austin, Dallas, and San Antonio--not to mention several decorative-stone locations around Texas. And the once-fledgling business was generating about $16 million in annual revenue.

As impressive as that growth was, under Eric's leadership between 1992 and 2000 the company expanded at a staggering rate. So much so that by 2000 its total gross receipts hovered around $60 million--almost four times what they were less than a decade earlier--and it had around 300 employees.

And it wasn't just Custom-Crete anymore. There were now several entities:

- CCI Manufacturing, Inc. (CCI)--the parent corporation of Custom-Crete and another company, Nova Concrete Express, Inc.;

- two general partnerships called RK-1 Partnership and Reinhart Partnership-1; and

- a limited partnership called Cottonwood Trucking 1, Ltd.

**[*5]** Eric and Doug owned two-thirds of CCI; their sister, Allyson Rahn, owned the other one-third. The ownership of the partnerships isn't as clear, but we know that those entities owned real estate and other tangible assets that CCI and its subsidiaries used. It wasn't long before the Reinhart family's success attracted the interest of a much larger corporation.

At a CCI board meeting in 1999, Bill Boorham--a nonfamily board member--volunteered that a company called Oldcastle Architectural Products Group (Oldcastle) had bought his own business. Boorham was very happy with the outcome--the new owner kept the old management in place. He offered to approach Oldcastle about selling CCI. The family was interested. Boorham went fishing, and Oldcastle took the bait.

Oldcastle, it turns out, excels through anonymity. It appears that it is a rather large company, but one that typically keeps the name and management of its regional acquisitions. And that's what happened here--Oldcastle made an offer in February 2000 to acquire CCI and its affiliated entities for around $30 million. It revised the offer a month later, and in July 2000 the Reinharts signed an approximately $30 million stock-and-asset purchase agreement.

Eric, Doug, and Allyson split most of the sale proceeds. On their 2000 tax returns Doug reported a gain from the sale of over $7 million, and Eric reported a

**[*6]** gain of about $6.3 million. Though both reported this income on the installment method, most of it was reported on their 2000 returns.

All that gain usually means a lot of tax. And the prospect of a big tax bill can attract tax sharpies; the Reinharts were about to meet two of them--Craig Brubaker and Erwin Mayer.

II.     New Taxpayers, Same Old Advisers

Eric and Doug did not look or feel wealthy before the CCI sale in 2000. Doug's investments were limited to small retirement accounts. And Eric and his wife maybe had about $200,000 spread among mutual funds and retirement accounts. But Eric was more of a planner than Doug; he had worked with a financial adviser--Randy Smith--since the late 1990s.

A month after the CCI sale closed in July, Eric signed a client engagement agreement with Smith, Frank & Partners, L.L.C. (Smith's firm), to prepare a written financial plan for a $3,400 flat fee. Eric then personally invested over $2 million of the sale proceeds before the end of the year--$1 million with an investment manager that Smith's firm recommended, and the remainder with two other financial advisers who put the share entrusted to them mostly in annuities and municipal bonds. He and his siblings each also contributed about $2 million

[*7] to a family limited partnership called Beefeater Assets, Ltd., which invested with the same investment manager that Smith's firm had recommended to Eric.

Eric put his money to work--conservatively, it seems--and sought out professional advice to do so. This means that we find that Eric knew how to get professional advice when he thought he needed it. In addition to the relationships that Eric established with investment advisers, he himself--both personally and as a fiduciary--had a pattern of seeking out other professional advice. For example:

- CCI maintained a long-term relationship with Marion McBryde of Weaver & Tidwell (W&T)--a respected regional accounting firm--who, among other chores, prepared CCI's annual tax returns;

- CCI hired a CFO in the late-1990s because the company was "getting more sophisticated"; and

- CCI retained Meadows, Owens, Collier, Reed, Cousins & Blau, L.L.P. (Meadows Owens), to represent Eric and his siblings in the CCI sale, and for estate planning.

Eric was soon to become acquainted with more advisers.

He knew from the engagement letter with Smith's firm that Smith wouldn't provide legal or accounting advice, but he still wanted to explore an options strategy that Smith said had "some very positive tax ramifications." It was a deal that Smith described as a "big-boy deal with Jenkens & Gilchrist," and Smith introduced Eric to Craig Brubaker from Deutsche Bank Alex. Brown (Deutsche

[*8] Bank) and Erwin Mayer from Jenkens & Gilchrist (J&G). Both these gentlemen have won tax-shelter fame. See, e.g., United States v. Woods, 571 U.S. 31, 34 (2013) (COBRA tax shelter developed by the now-defunct J&G law firm, which involved options sold by Deutsche Bank); Indictment, United States v. Daugerdas, No. 1:09-CR-00581-WHP (S.D.N.Y. June 9, 2009), ECF No. 1 (Brubaker and Mayer, among others, indicted for tax-fraud conspiracy involving tax shelters).[2]

Eric spoke to Brubaker over the phone a couple of times about the transaction, and he and Allyson had a call with Mayer--the "tax guru in th[e] deal." Eric said that Mayer told them the transaction "was a complicated deal" with "some real positive tax ramifications," and "that with th[e] opinion letter, * * * there would not be any problems with the IRS." Allyson wasn't interested. But Eric was. And after Eric told him about it, so was Doug.

Mayer sent Eric and Doug a confidentiality agreement in September 2000.[3] Eric had signed confidentiality agreements before--for the Oldcastle deal, for

---

[2] Brubaker was acquitted after a jury trial in 2011. See Judgment of Acquittal, United States v. Brubaker, No. 1:09-CR-00581-WHP (S.D.N.Y. May 25, 2011), ECF No. 396.

[3] The confidentiality agreement was also addressed to Mr. Reinhart, but he didn't ultimately take part in the deal.

**[\*9]** example--but he had never been asked to sign one by a law firm. Eric didn't question this; he and Doug signed the agreement in October 2000, and Mayer began to share more about the transaction. Everyone needed to move quickly--the end of the Reinharts' tax year loomed.

Eric decided to plunge ahead. In November 2000 he told J&G to move forward and, for a $400,000 fee, it did.

A.    Forming Entities and Opening Accounts

It formed four new entities:

- PER Alpha Investments, LLC (PER Alpha), a Delaware LLC that Eric wholly owned and that was disregarded for federal income tax purposes;

- JDR Rolling Hills Investments, LLC (JDR Rolling), a Delaware LLC that Doug wholly owned and that was disregarded for federal income tax purposes;

- RB-1, a Texas general partnership owned 60/40 by PER Alpha and JDR Rolling, respectively; and

- E&D Investors, Inc. (E&D), a Delaware corporation that elected to be an S corporation for federal income tax purposes and was owned 60/40 by Eric and Doug, respectively.

These new entities then opened accounts with Deutsche Bank.

**[*10]** B.     Buying the Digital Options

PER Alpha and JDR Rolling bought and sold European-style foreign-currency digital options[4] with Deutsche Bank--taking long and short positions tied to the Japanese yen/U.S. dollar exchange rate.  PER Alpha bought a $6 million long option, and JDR Rolling bought a $4 million long option.  But PER Alpha also sold a $5.94 million short option, and JDR Rolling sold a $3.96 million short option.  These amounts were netted, so PER Alpha actually paid only $60,000 for its long option and JDR Rolling paid only $40,000 for its long option--a total of $100,000.

The long options in these pairs were bets that Japanese yen would be trading at or above ¥110.40/$1.00 on the strike date, which was about three weeks out.  If the yen was in that range, Deutsche Bank would pay PER Alpha and JDR Rolling a total of $20 million.  But there was a catch:  The LLCs would have to pay

---

[4] We've described these before:

> There are two basic types of options--American and European.  A European option can be exercised only at maturity.  An American option can be exercised anytime during the life of the option.  A digital option has only two possible outcomes at expiration:  some fixed payoff amount or nothing.  Digital options are typically also European-style options, which means that they can be exercised only on the option's expiration date. * * *

BCP Trading & Invs., LLC v. Commissioner, T.C. Memo. 2017-151, at *16 n.6.

**[\*11]** Deutsche Bank a total of $19.8 million under the short options if the yen was over ¥110.42/$1.00. These almost perfectly offsetting options had a two "pip" spread.[5]

These large notional amounts are meant to conceal something: In all likelihood, the brothers would either lose their $100,000 net premium if the exchange rate on the strike date was below ¥110.40/$1.00 and the options expired worthless, or they would be paid at most $200,000[6] if the exchange rate on the strike date was at or above ¥110.42/$1.00[7]--which would still be an economic loss of at least $300,000 because of J&G's $400,000 legal fee. Those who sell these

---

[5] A "pip" stands for "percentage in point" and is the smallest pricing increment used in foreign-exchange markets. For a Japanese yen/U.S. dollar trade, for example, a pip is .01. If the Japanese yen is trading at ¥78.41/$1.00 and weakens by one pip, the new price will be ¥78.42/$1.00. See BCP Trading & Invs., LLC, at \*16 n.8.

[6] The net difference between the $20 million that Deutsche Bank would be obligated to pay and the $19.8 million that PER Alpha and JDR Rolling would be obligated to pay.

[7] The tiny, two-pip spread is typical in these cases, and entirely illusory. Deutsche Bank had control over the spot rate--it was the calculation agent in the option agreements and got to determine the spot rate of the currencies as of 10 a.m. in New York City on the strike date. Cf. New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 178-79, 183 (2009) (finding in similar transaction that Deutsche Bank--as calculation agent--would never let the transaction hit the "sweet spot" because there was only a 2-pip spread and the bank would have the choice of spot rates with a 3-pip spread), aff'd, 408 F. App'x 908 (6th Cir. 2010).

[*12] deals always emphasize a chance of hitting the "sweet spot," because if the strike-date exchange rate were exactly ¥110.40/$1.00 or ¥110.41/$1.00 the payout would have been $20 million. But the odds of this are infinitesimal, and Eric didn't even fully grasp that possibility.[8] Indeed, we don't think Eric understood this absurdly complex transaction at all, except that he knew it would generate a huge tax loss to offset the brothers' gain from the CCI sale.

C.     Manufacturing Tax Losses

Now that PER Alpha and JDR Rolling had their offsetting digital options, there were only a few steps left. PER Alpha and JDR Rolling transferred the offsetting options to RB-1--which had already bought about $75,000 in publicly traded stocks. RB-1 took an inside basis in the long options of $10 million unreduced by the offsetting short-option liabilities. PER Alpha and JDR Rolling also increased their outside bases in RB-1 by $10 million.

Not long after the options were transferred, Deutsche Bank paid RB-1 $120,000 to cancel the outstanding digital options early--$20,000 more than the

---

[8] Eric testified: "[I]t was a pretty slim chance of hitting the sweet spot, but that if for some reason this transaction ended up right on the cusp of a trade--*and I don't understand exactly how it would happen*--there was a possibility of making millions of dollars." (Emphasis added.) When asked if he understood what the "sweet spot" was, Eric said: "Not exactly, no. I mean, I knew there was a sweet spot, but exactly what the number was, I had no idea." We don't think he cared; we find that the tax losses were the real point of the deal.

**[*13]** net price of the long options, but still a $380,000 economic loss if you count J&G's $400,000 fee. PER Alpha and JDR Rolling then contributed their RB-1 partnership interests to E&D, which caused RB-1 to liquidate as a matter of law. RB-1 distributed its remaining assets, including the publicly traded securities it had recently bought for about $75,000. Property that is distributed when a partnership liquidates takes a basis equal to the partners' outside basis in the partnership (reduced by any cash distributed). <u>See</u> sec. 732(b).[9] The partners in a Son-of-BOSS deal then stick this artificially inflated outside basis onto the distributed securities.

The securities are, of course, worth far less. So when E&D sold the securities that RB-1 had bought for $75,000, it reported about $10 million in capital losses that it passed on to its shareholders--Eric and Doug.

---

[9] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[*14] D.    Preparing the Returns

Eric didn't consult any advisers other than Smith, J&G, and Deutsche Bank about the options strategy before the transaction was completed.[10] Afterwards, he went to Marion McBryde at W&T to prepare RB-1's 2000 partnership return.

McBryde asked Eric to sign an engagement letter. The engagement letter said that W&T would rely on documents prepared by J&G "to give expert guidance on the handling of certain transactions"--they would "not render any additional opinion to the results of this position." To make sure W&T prepared the return consistently with J&G's guidance, the engagement letter also authorized W&T "to provide draft copies of all the * * * tax returns to Erwin Mayer, Esq., of [J&G] for review and approval." W&T told Eric they wouldn't complete the return without J&G's stamp of approval, and Eric admitted at trial that he didn't expect W&T to render an opinion separate from the J&G opinion.

J&G played a significant role in getting the return done. It provided the all-important opinion letter: Hilda Merritt--the W&T manager who actually reviewed

---

[10] Eric testified that he also spoke to his investment manager, the CFO of CCI, and Marion McBryde, but he admitted that he told the investment manager only that he was considering something with tax ramifications. McBryde testified --and we believe him--that he didn't become aware of the J&G transaction until Eric came to him for the return preparation. And even if Eric did talk to CCI's CFO about the transaction--a fact that we are not sure about--we don't think he can fairly be characterized as Eric's or RB-1's adviser in these circumstances.

**[\*15]** the return--said that Eric asked them "to rely on that opinion." But J&G did even more. Its attorneys reviewed the return to make sure it was consistent with the opinion letter, and J&G confirmed that their opinion hadn't changed before W&T released the return.[11]

But what about J&G's opinion letter? It has all the misdirection we've come to expect in Son-of-BOSS cases. There is a 10-page letter specific to the deal, followed by 125 pages of more-or-less boilerplate that purports to explain why the deal works for tax purposes. The linchpin of the opinion, as usual, turns on the partnership-tax rules, which wouldn't apply if there were no partnership. See, e.g., BCP Trading & Invs., LLC v. Commissioner, T.C. Memo. 2017-151, at \*49-\*58 (no valid partnership unless parties are joining together to undertake an ongoing enterprise with some business purpose other than tax avoidance). To deal with that problem, the opinion letter says J&G relied on the Reinhart brothers' representations that:

- they entered into the deal "for substantial nontax business reasons, including \* \* \* to produce overall economic profits because of [their] belief that the Japanese Yen/U.S. Dollar exchange rate relationship would change";

---

[11] For example, after seeing the first draft of the return, an attorney from J&G wanted changes made--including a change to tuck J&G's $400,000 fee into basis instead of claiming a deduction for it. So the attorney called Merritt, and she made sure those changes were made before finishing the return.

[*16]  •  they "contributed the Options to the Partnership for substantial nontax business reasons, including * * * potential diversification of the risks of certain investments, the desire to co-invest * * * and for * * * convenience"; and

•  they contributed the RB-1 partnership interests to E&D "for substantial nontax business reasons including * * * consolidation of investment activities, bookkeeping, accounting and tax functions and elimination of duplicate work and expenses in administration."

Eric and Doug did no such things. But Eric told W&T to follow the opinion letter anyway. So W&T completed RB-1's return on that basis, with substantial input from J&G.

## III.    Case Development and Trial

RB-1 served its purpose for a time. The Reinhart brothers took huge flow-through losses from the sale of RB-1's distributed assets at the end of 2000--just in time to offset a large chunk of the gains from the CCI sale earlier that year. But the Commissioner issued a notice of final partnership administrative adjustment (FPAA) to RB-1 that determined it was a sham.[12] And because it was a sham, the

_____

[12] Before its repeal, see Bipartisan Budget Act of 2015, Pub. L. No. 114-74, sec. 1101(a), 129 Stat. at 625, part of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) governed the tax treatment and audit procedures for many partnerships, see Pub. L. No. 97-248, secs. 401-407, 96 Stat. at 648-71. TEFRA partnerships are subject to special tax and audit rules. See secs. 6221-6234. TEFRA requires the uniform treatment of all "partnership item[s]"--a term defined by section 6231(a)(3)--and its general goal is to have a single point of adjustment for the IRS rather than having it make separate partnership-item adjustments on

(continued...)

[*17] Commissioner determined that the partners "have not established adjusted bases in their respective partnership interests in an amount greater than zero." The Commissioner also asserted accuracy-related penalties.

E&D--RB-1's original tax matters partner (TMP)[13]--disagreed with the Commissioner's adjustments, so it timely petitioned the Court.[14] Eric Reinhart-- the correct TMP--represented RB-1. A trial followed, at the end of which we held the record open so that Brubaker and Mayer could eventually testify--the Fifth Amendment stood in the way at the time. But years passed and their lips remained sealed, so the parties finally moved to close the record and briefed the case.

OPINION

Eric now concedes the partnership-item adjustments on behalf of RB-1, and the parties agreed at trial that the mathematical test for the 40% gross-valuation-

---

[12](...continued)
each partner's individual return. See H.R. Conf. Rept. No. 97-760, at 599-601 (1982), 1982-2 C.B. 600, 662-63.

[13] Under TEFRA, a "partnership" is supposed to designate a TMP to handle its administrative issues with the Commissioner and manage any resulting litigation. See sec. 6231(a)(7).

[14] RB-1 no longer existed when the petition was filed, so it didn't have a principal place of business anymore. This case is therefore appealable to the D.C. Circuit. See sec. 7482(b)(1); see also 106 Ltd. v. Commissioner, 684 F.3d 84, 89 n.9 (D.C. Cir. 2012), aff'g 136 T.C. 67 (2011).

**[*18]** misstatement penalty has been satisfied. The only remaining question is whether that is enough for the penalty under section 6662 to apply here. Eric argues that it isn't, because RB-1 showed reasonable cause and acted in good faith by relying on professional advice from J&G and W&T. The Commissioner says that RB-1 doesn't meet that exception to the penalty's applicability because J&G was a promoter and W&T didn't actually give any advice.

Before we pour the slab specific to RB-1's reasonable-cause-and-good-faith defense, let us build the form.

## I. TEFRA and Penalties

We have jurisdiction in a TEFRA proceeding to determine partnership items and "the applicability of any penalty * * * which relates to an adjustment to a partnership item." Sec. 6226(f); Woods, 571 U.S. at 39. The Supreme Court has held: "TEFRA gives courts in partnership-level proceedings jurisdiction to determine the applicability of any penalty that could result from an adjustment to a partnership item, even if imposing the penalty would also require determining affected or non-partnership items such as *outside basis*." Woods, 571 U.S. at 41 (emphasis added). Eric concedes that RB-1 was a sham, so we have jurisdiction to determine the applicability of the gross-valuation-misstatement penalty for overstated outside basis in the partnership. See id. at 42; see also NPR Invs.,

**[\*19]** L.L.C. v. United States, 740 F.3d 998, 1010 (5th Cir. 2014). This penalty applies where a taxpayer underpays tax because he overstated the adjusted basis of property on his tax return by 400% or more, sec. 6662(a), (b)(3), (e)(1)(A), (h), and the parties agree that the penalty could apply here on the basis of simple math.

And the penalty will apply here unless RB-1 can show that it had reasonable cause and acted in good faith.[15] See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs.; see also 106 Ltd. v. Commissioner, 136 T.C. 67, 77 (2011) (reasonable-cause-and-good-faith defense may be asserted at partnership level), aff'd, 684 F.3d 84 (D.C. Cir. 2012). At the partnership level, the reasonable-cause-and-good-faith defense takes "into account the state of mind of the general partner." Superior Trading, LLC v. Commissioner, 137 T.C. 70, 91 (2011) (citing New Millennium Trading, LLC v. Commissioner, 131 T.C. 275 (2008)), aff'd, 728 F.3d 676 (7th

---

[15] The Commissioner didn't produce any evidence of his compliance with section 6751(b)(1), see Graev v. Commissioner, 149 T.C. __, __ (slip op. at 13-15) (Dec. 20, 2017), supplementing 147 T.C. 460 (2016), which would normally result in a holding that the Commissioner failed to meet his burden of production on the penalty, see, e.g., Ford v. Commissioner, T.C. Memo. 2018-8, at \*6. We recently held, however, that the Commissioner does not bear the burden of production on penalties in TEFRA partnership-level proceedings. Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. __, __ (slip op. at 21) (May 7, 2018). That means that the burden of production on this issue fell on Eric, who could have raised lack of compliance with section 6751(b)(1) as a defense to penalties, see id. at __ (slip op. at 21-22), but who failed to do that at any stage. The defense is therefore waived. Id. (citing Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989), and Rule 151).

[*20] Cir. 2013). Eric was PER Alpha's sole member, and PER Alpha was RB-1's managing partner. Eric is also RB-1's current TMP, and he was the president and majority shareholder of RB-1's former TMP, E&D. We will therefore consider Eric's state of mind to determine whether RB-1 satisfies the reasonable-cause-and-good-faith defense. See id. at 91-92.

Taxpayers often argue that they had reasonable cause and showed good faith by relying on professional advice. The regulations circularly state that reliance on professional advice is "reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6664-4(b)(1), Income Tax Regs. The caselaw more helpfully points to three factors to test whether a taxpayer properly relied on professional advice. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

- First, was the adviser a competent professional who had sufficient expertise to justify reliance?

- Second, did the taxpayer provide necessary and accurate information to the adviser?

- Third, did the taxpayer actually rely in good faith on the adviser's judgment?

[*21] Eric claims reasonable reliance on the professional advice of both J&G and W&T.

## II. Reliance on J&G

J&G clears the first two hurdles for reasonable reliance. It was a well-respected, large law firm when the transaction happened, and the attorneys there certainly would have appeared competent to render expert tax advice--particularly to a person like Eric who ran a successful business but lacked tax expertise. And Eric gave the J&G attorneys all the information they needed. The Commissioner doesn't doubt that J&G meets these requirements.

But the Commissioner does doubt that Eric actually relied in good faith on J&G's judgment. He says J&G was a promoter, and that a partnership can't satisfy the reasonable-cause-and-good-faith defense to penalties by relying on a promoter, because reliance on a promoter takes the good faith out of good-faith reliance. See 106 Ltd., 684 F.3d at 90-91; Neonatology Assocs., 115 T.C. at 98. And we know what a promoter is: "'[A]n adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction.'" 106 Ltd., 136 T.C. at 79 (quoting Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121, 2009 WL 1475159, at *19). The label fits

**[*22]** particularly well when "the transaction involved is the same tax shelter offered to numerous parties." See id. at 80.

J&G was a promoter, but Eric argues that he couldn't have known that back in 2000 before its tax-shelter scheme came to light. We, however, will hold him accountable for the things he did know or that he should have known back then. See 106 Ltd., 684 F.3d at 90 (reasonable-cause-and-good-faith "inquiry is objective, 'focus[ing] * * * on what [the taxpayer] knew or should have known at the time he obtained the [advice]" (quoting Am. Boat Co., LLC v. United States, 583 F.3d 471, 485 (7th Cir. 2009) (alterations in original))).

Eric knew, or should have known, that J&G was selling this tax shelter to numerous parties. He learned about the transaction from Smith, who said it was a "big-boy deal with Jenkens & Gilchrist"--that it "took a lot of money to get in" and "there were some very positive tax ramifications." Smith introduced Eric to other advisers, but we find that no other advisers were introduced with one specific transaction in mind. And Mayer left no doubt in Eric's mind that the transaction wasn't tailor-made for him: Mayer told him he'd undertaken the same type of transaction with other clients, and Eric "got the impression that it was lots" of clients. Eric even knew that the legal analysis in the J&G opinion letter wasn't

[*23] written just for him.  We therefore find that Eric knew the transaction was the same tax shelter that J&G offered to numerous parties.

After Eric agreed to proceed, J&G ran with the rest of the transaction.  It completed all the documents to form the entities, open the accounts at Deutsche Bank, and transfer the options to RB-1 and RB-1's partnership interests to E&D.  J&G provided the dubious opinion letter about the deal's tax consequences, and it ensured that RB-1's returns were completed and filed consistently with the opinion letter.  And RB-1 paid J&G a $400,000 fee for its work--a fee that was supported by only a one-sentence invoice:  "Fees for professional services rendered through November 20, 2000."  Before that, Eric had never paid a legal fee greater than $100,000, even for the work that Meadows Owens did for the CCI sale.  The difference is that J&G wasn't paid to provide tax advice for a real transaction; its fee was for a packaged tax shelter.  We therefore find that J&G was a promoter, and Eric may not rely upon J&G's advice in good faith.

III.    Reliance on W&T

Even if J&G was a promoter, Eric argues that RB-1 can still establish reasonable cause and good faith because he relied on W&T's professional advice-- that W&T prepared RB-1's return, reviewed it internally, and signed it without ever advising Eric not to file it.  As with J&G, the Commissioner doesn't focus

[*24] much on W&T's competence to render tax advice or whether Eric provided

W&T with all necessary information. But he does argue that Eric didn't rely in

good faith on W&T's judgment because W&T didn't provide any advice.

What is "advice"? Start with the regulation:

> Advice is any communication, including the opinion of a professional
> tax advisor, setting forth the analysis or conclusion of a person, other
> than the taxpayer, provided to (or for the benefit of) the taxpayer and
> on which the taxpayer relies, directly or indirectly, with respect to the
> imposition of the section 6662 accuracy-related penalty. Advice does
> not have to be in any particular form.

Sec. 1.6664-4(c)(2), Income Tax Regs.; see also Woodsum v. Commissioner, 136

T.C. 585, 592-93 (2011). There is no "advice" without some communication from

the adviser, and that communication must set forth the adviser's analysis or

conclusion. Woodsum, 136 T.C. at 593. "In other words, a taxpayer cannot

escape the penalty when the taxpayer does not seek or receive an opinion from his

or her preparer." Minchem Int'l, Inc. v. Commissioner, T.C. Memo. 2015-56, at

*59, aff'd sub nom. Sun v. Commissioner, 880 F.3d 173 (5th Cir. 2018). And just

because a CPA prepared the tax return doesn't mean "he or she has opined on any

or all of the items reported therein." Neonatology Assocs., P.A., 115 T.C. at 100.

That's what was going on here. Not only did W&T fail to opine on the

items reported on RB-1's return; it told Eric that it wasn't going to. The

[*25] engagement letter that Eric signed said that W&T would rely on J&G's documents "to give expert guidance on the handling of certain transactions," and W&T would "not render any additional opinion to the results of this position." Eric authorized W&T to provide a draft copy of the return to Mayer at J&G for review and approval, and he was aware that W&T wouldn't complete the return without J&G's approval. The return was in fact completed only after J&G's attorneys approved it, and Eric never expected W&T to provide an opinion separate from J&G's. It is simply not enough that W&T completed the return and failed to tell Eric not to file it. See id. And it should come as no surprise that we don't think W&T provided any "advice" here: The engagement letter said that it wouldn't, and the steps that its accountants took to complete the return were consistent with that engagement letter.

J&G provided the only professional advice in this case. But RB-1 can't meet the reasonable-cause-and-good-faith defense to penalties by relying on the advice of a promoter. See, e.g., 106 Ltd., 684 F.3d at 90-91; Neonatology Assocs., 115 T.C. at 98. Accordingly,

An appropriate decision will be

entered.